# UNITED STATES ET AL. *v.* PLAYBOY ENTERTAINMENT GROUP, INC.

No. 98–1682.   Argued November 30, 1999—Decided May 22, 2000

804

KENNEDY, J., delivered the opinion of the Court, in which STEVENS, SOUTER, THOMAS, and GINSBURG, JJ., joined. STEVENS, J., *post*, p. 828, and THOMAS, J., *post*, p. 829, filed concurring opinions. SCALIA, J., filed a dissenting opinion, *post*, p. 831. BREYER, J., filed a dissenting opinion, in which REHNQUIST, C. J., and O'CONNOR and SCALIA, JJ., joined, *post*, p. 835.

*James A. Feldman* argued the cause for appellants. With him on the briefs were *Solicitor General Waxman, Acting*

■■■■■■■■■■■■

*Assistant Attorney General Schultz, Deputy Solicitor General Kneedler, Jacob M. Lewis, Edward Himmelfarb,* and *Christopher J. Wright.*

*Robert Corn-Revere* argued the cause for appellees. With him on the brief were *Jean S. Moore* and *Burton Joseph.**

JUSTICE KENNEDY delivered the opinion of the Court.

This case presents a challenge to § 505 of the Telecommunications Act of 1996, Pub. L. 104–104, 110 Stat. 136, 47 U. S. C. § 561 (1994 ed., Supp. III). Section 505 requires cable television operators who provide channels "primarily dedicated to sexually-oriented programming" either to "fully scramble or otherwise fully block" those channels or to limit their transmission to hours when children are unlikely to be viewing, set by administrative regulation as the time between 10 p.m. and 6 a.m. 47 U. S. C. § 561(a) (1994 ed., Supp. III); 47 CFR § 76.227 (1999). Even before enactment of the statute, signal scrambling was already in use. Cable operators used scrambling in the regular course of business, so that only paying customers had access to certain programs. Scrambling could be imprecise, however; and either or both audio and visual portions of the scrambled programs might be heard or seen, a phenomenon known as "signal bleed." The purpose of § 505 is to shield children from hearing or seeing images resulting from signal bleed.

To comply with the statute, the majority of cable operators adopted the second, or "time channeling," approach. The effect of the widespread adoption of time channeling was to

---

*\*Janet M. LaRue, Paul J. McGeady,* and *Bruce Taylor* filed a brief for the Family Research Council et al. as *amici curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed for the American Booksellers Foundation for Free Expression et al. by *Michael A. Bamberger;* for the Media Institute by *Laurence H. Winer;* for the National Cable Television Association by *Daniel L. Brenner* and *Michael S. Schooler;* for Sexuality Scholars, Researchers, Educators, and Therapists by *Marjorie Heins* and *Joan E. Bertin;* and for the Thomas Jefferson Center for the Protection of Free Expression by *J. Joshua Wheeler.*

eliminate altogether the transmission of the targeted programming outside the safe harbor period in affected cable service areas. In other words, for two-thirds of the day no household in those service areas could receive the programming, whether or not the household or the viewer wanted to do so.

Appellee Playboy Entertainment Group, Inc., challenged the statute as unnecessarily restrictive content-based legislation violative of the First Amendment. After a trial, a three-judge District Court concluded that a regime in which viewers could order signal blocking on a household-by-household basis presented an effective, less restrictive alternative to § 505. 30 F. Supp. 2d 702, 719 (Del. 1998). Finding no error in this conclusion, we affirm.

## I

Playboy Entertainment Group owns and prepares programs for adult television networks, including Playboy Television and Spice. Playboy transmits its programming to cable television operators, who retransmit it to their subscribers, either through monthly subscriptions to premium channels or on a so-called "pay-per-view" basis. Cable operators transmit Playboy's signal, like other premium channel signals, in scrambled form. The operators then provide paying subscribers with an "addressable converter," a box placed on the home television set. The converter permits the viewer to see and hear the descrambled signal. It is conceded that almost all of Playboy's programming consists of sexually explicit material as defined by the statute.

The statute was enacted because not all scrambling technology is perfect. Analog cable television systems may use either "RF" or "baseband" scrambling systems, which may not prevent signal bleed, so discernible pictures may appear from time to time on the scrambled screen. Furthermore, the listener might hear the audio portion of the program.

These imperfections are not inevitable. The problem is that at present it appears not to be economical to convert simpler RF or baseband scrambling systems to alternative scrambling technologies on a systemwide scale. Digital technology may one day provide another solution, as it presents no bleed problem at all. Indeed, digital systems are projected to become the technology of choice, which would eliminate the signal bleed problem. Digital technology is not yet in widespread use, however. With imperfect scrambling, viewers who have not paid to receive Playboy's channels may happen across discernible images of a sexually explicit nature. How many viewers, how discernible the scene or sound, and how often this may occur are at issue in this case.

Section 505 was enacted to address the signal bleed phenomenon. As noted, the statute and its implementing regulations require cable operators either to scramble a sexually explicit channel in full or to limit the channel's programming to the hours between 10 p.m. and 6 a.m. 47 U. S. C. § 561 (1994 ed., Supp. III); 47 CFR § 76.227 (1999). Section 505 was added by floor amendment, without significant debate, to the Telecommunications Act of 1996 (Act), a major legislative effort designed "to reduce regulation and encourage 'the rapid deployment of new telecommunications technologies.'" *Reno* v. *American Civil Liberties Union*, 521 U. S. 844, 857 (1997) (quoting 110 Stat. 56). "The Act includes seven Titles, six of which are the product of extensive committee hearings and the subject of discussion in Reports prepared by Committees of the Senate and the House of Representatives." *Reno, supra,* at 858. Section 505 is found in Title V of the Act, which is itself known as the Communications Decency Act of 1996 (CDA). 110 Stat. 133. Section 505 was to become effective on March 9, 1996, 30 days after the Act was signed by the President. Note following 47 U. S. C. § 561 (1994 ed., Supp. III).

On March 7, 1996, Playboy obtained a temporary restraining order (TRO) enjoining the enforcement of § 505. 918 F. Supp. 813 (Del.), and brought this suit in a three-judge District Court pursuant to § 561 of the Act, 110 Stat. 142, note following 47 U. S. C. § 223 (1994 ed., Supp. III). Playboy sought a declaration that § 505 violates the Constitution and an injunction prohibiting the law's enforcement. The District Court denied Playboy a preliminary injunction, 945 F. Supp. 772 (Del. 1996), and we summarily affirmed, 520 U. S. 1141 (1997). The TRO was lifted, and the Federal Communications Commission announced it would begin enforcing § 505 on May 18, 1997. *In re Implementation of Section 505 of the Telecommunications Act of 1996*, 12 FCC Rcd. 5212, 5214 (1997).

When the statute became operative, most cable operators had "no practical choice but to curtail [the targeted] programming during the [regulated] sixteen hours or risk the penalties imposed . . . if any audio or video signal bleed occur[red] during [those] times." 30 F. Supp. 2d, at 711. The majority of operators—"in one survey, 69%"—complied with § 505 by time channeling the targeted programmers. *Ibid.* Since "30 to 50% of all adult programming is viewed by households prior to 10 p.m.," the result was a significant restriction of communication, with a corresponding reduction in Playboy's revenues. *Ibid.*

In March 1998, the District Court held a full trial and concluded that § 505 violates the First Amendment. *Id.*, at 702. The District Court observed that § 505 imposed a content-based restriction on speech. *Id.*, at 714–715. It agreed that the interests the statute advanced were compelling but concluded the Government might further those interests in less restrictive ways. *Id.*, at 717–720. One plausible, less restrictive alternative could be found in another section of the Act: § 504, which requires a cable operator, "[u]pon request by a cable service subscriber . . . without charge, [to] fully

scramble or otherwise fully block" any channel the subscriber does not wish to receive. 110 Stat. 136, 47 U. S. C. § 560 (1994 ed., Supp. III). As long as subscribers knew about this opportunity, the court reasoned, § 504 would provide as much protection against unwanted programming as would § 505. 30 F. Supp. 2d, at 718–720. At the same time, § 504 was content neutral and would be less restrictive of Playboy's First Amendment rights. *Ibid.*

The court described what "adequate notice" would include, suggesting

> "[operators] should communicate to their subscribers the information that certain channels broadcast sexually-oriented programming; that signal bleed ... may appear; that children may view signal bleed without their parents' knowledge or permission; that channel blocking devices ... are available free of charge ... ; and that a request for a free device ... can be made by a telephone call to the [operator]." *Id.,* at 719.

The means of providing this notice could include

> "inserts in monthly billing statements, barker channels (preview channels of programming coming up on Pay-Per-View), and on-air advertisement on channels other than the one broadcasting the sexually explicit programming." *Ibid.*

The court added that this notice could be "conveyed on a regular basis, at reasonable intervals," and could include notice of changes in channel alignments. *Ibid.*

The District Court concluded that § 504 so supplemented would be an effective, less restrictive alternative to § 505, and consequently declared § 505 unconstitutional and enjoined its enforcement. *Id.,* at 719–720. The court also required Playboy to insist on these notice provisions in its contracts with cable operators. *Ibid.*

The United States filed a direct appeal in this Court pursuant to § 561. The District Court thereafter dismissed for

lack of jurisdiction two post-trial motions filed by the Government. App. to Juris. Statement 91a–92a. We noted probable jurisdiction, 527 U. S. 1021 (1999), and now affirm.

## II

Two essential points should be understood concerning the speech at issue here. First, we shall assume that many adults themselves would find the material highly offensive; and when we consider the further circumstance that the material comes unwanted into homes where children might see or hear it against parental wishes or consent, there are legitimate reasons for regulating it. Second, all parties bring the case to us on the premise that Playboy's programming has First Amendment protection. As this case has been litigated, it is not alleged to be obscene; adults have a constitutional right to view it; the Government disclaims any interest in preventing children from seeing or hearing it with the consent of their parents; and Playboy has concomitant rights under the First Amendment to transmit it. These points are undisputed.

The speech in question is defined by its content; and the statute which seeks to restrict it is content based. Section 505 applies only to channels primarily dedicated to "sexually explicit adult programming or other programming that is indecent." The statute is unconcerned with signal bleed from any other channels. See 945 F. Supp., at 785 ("[Section 505] does not apply when signal bleed occurs on other premium channel networks, like HBO or the Disney Channel"). The overriding justification for the regulation is concern for the effect of the subject matter on young viewers. Section 505 is not "'justified without reference to the content of the regulated speech.'" *Ward* v. *Rock Against Racism,* 491 U. S. 781, 791 (1989) (quoting *Clark* v. *Community for Creative Non-Violence,* 468 U. S. 288, 293 (1984)). It "focuses *only* on the content of the speech and the direct impact that speech has on its listeners." *Boos* v. *Barry,* 485 U. S. 312,

321 (1988) (opinion of O'CONNOR, J.). This is the essence of content-based regulation.

Not only does § 505 single out particular programming content for regulation, it also singles out particular programmers. The speech in question was not thought by Congress to be so harmful that all channels were subject to restriction. Instead, the statutory disability applies only to channels "primarily dedicated to sexually-oriented programming." 47 U. S. C. § 561(a) (1994 ed., Supp. III). One sponsor of the measure even identified appellee by name. See 141 Cong. Rec. 15587 (1995) (statement of Sen. Feinstein) (noting the statute would apply to channels "such as the Playboy and Spice channels"). Laws designed or intended to suppress or restrict the expression of specific speakers contradict basic First Amendment principles. Section 505 limited Playboy's market as a penalty for its programming choice, though other channels capable of transmitting like material are altogether exempt.

The effect of the federal statute on the protected speech is now apparent. It is evident that the only reasonable way for a substantial number of cable operators to comply with the letter of § 505 is to time channel, which silences the protected speech for two-thirds of the day in every home in a cable service area, regardless of the presence or likely presence of children or of the wishes of the viewers. According to the District Court, "30 to 50% of all adult programming is viewed by households prior to 10 p.m.," when the safe-harbor period begins. 30 F. Supp. 2d, at 711. To prohibit this much speech is a significant restriction of communication between speakers and willing adult listeners, communication which enjoys First Amendment protection. It is of no moment that the statute does not impose a complete prohibition. The distinction between laws burdening and laws banning speech is but a matter of degree. The Government's content-based burdens must satisfy the same rigorous scrutiny as its content-based bans.

Since § 505 is a content-based speech restriction, it can stand only if it satisfies strict scrutiny. *Sable Communications of Cal., Inc.* v. *FCC*, 492 U. S. 115, 126 (1989). If a statute regulates speech based on its content, it must be narrowly tailored to promote a compelling Government interest. *Ibid.* If a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative. *Reno*, 521 U. S., at 874 ("[The CDA's Internet indecency provisions'] burden on adult speech is unacceptable if less restrictive alternatives would be at least as effective in achieving the legitimate purpose that the statute was enacted to serve"); *Sable Communications, supra*, at 126 ("The Government may . . . regulate the content of constitutionally protected speech in order to promote a compelling interest if it chooses the least restrictive means to further the articulated interest"). To do otherwise would be to restrict speech without an adequate justification, a course the First Amendment does not permit.

Our precedents teach these principles. Where the designed benefit of a content-based speech restriction is to shield the sensibilities of listeners, the general rule is that the right of expression prevails, even where no less restrictive alternative exists. We are expected to protect our own sensibilities "simply by averting [our] eyes." *Cohen* v. *California*, 403 U. S. 15, 21 (1971); accord, *Erznoznik* v. *Jacksonville*, 422 U. S. 205, 210–211 (1975). Here, of course, we consider images transmitted to some homes where they are not wanted and where parents often are not present to give immediate guidance. Cable television, like broadcast media, presents unique problems, which inform our assessment of the interests at stake, and which may justify restrictions that would be unacceptable in other contexts. See *Denver Area Ed. Telecommunications Consortium, Inc.* v. *FCC*, 518 U. S. 727, 744 (1996) (plurality opinion); *id.*, at 804–805 (KENNEDY, J., concurring in part, concurring in judgment in part, and dissenting in part); *FCC* v. *Pacifica Foundation*, 438

U. S. 726 (1978). No one suggests the Government must be indifferent to unwanted, indecent speech that comes into the home without parental consent. The speech here, all agree, is protected speech; and the question is what standard the Government must meet in order to restrict it. As we consider a content-based regulation, the answer should be clear: The standard is strict scrutiny. This case involves speech alone; and even where speech is indecent and enters the home, the objective of shielding children does not suffice to support a blanket ban if the protection can be accomplished by a less restrictive alternative.

In *Sable Communications*, for instance, the feasibility of a technological approach to controlling minors' access to "dial-a-porn" messages required invalidation of a complete statutory ban on the medium. 492 U. S., at 130–131. And, while mentioned only in passing, the mere possibility that user-based Internet screening software would "'soon be widely available'" was relevant to our rejection of an overbroad restriction of indecent cyberspeech. *Reno, supra,* at 876–877. Compare *Rowan* v. *Post Office Dept.,* 397 U. S. 728, 729–730 (1970) (upholding statute "whereby any householder may insulate himself from advertisements that offer for sale 'matter which the addressee in his sole discretion believes to be erotically arousing or sexually provocative'" (quoting then 39 U. S. C. § 4009(a) (1964 ed., Supp. IV))), with *Bolger* v. *Youngs Drug Products Corp.,* 463 U. S. 60, 75 (1983) (rejecting blanket ban on the mailing of unsolicited contraceptive advertisements). Compare also *Ginsberg* v. *New York,* 390 U. S. 629, 631 (1968) (upholding state statute barring the sale to minors of material defined as "obscene on the basis of its appeal to them"), with *Butler* v. *Michigan,* 352 U. S. 380, 381 (1957) (rejecting blanket ban of material "'tending to incite minors to violent or depraved or immoral acts, manifestly tending to the corruption of the morals of youth'" (quoting then Mich. Penal Code § 343)). Each of these cases arose in a different context—*Sable Communica-*

*tions* and *Reno,* for instance, also note the affirmative steps necessary to obtain access to indecent material via the media at issue—but they provide necessary instruction for complying with accepted First Amendment principles.

Our zoning cases, on the other hand, are irrelevant to the question here. *Post,* at 838 (BREYER, J., dissenting) (citing *Renton* v. *Playtime Theatres, Inc.,* 475 U. S. 41 (1986), and *Young* v. *American Mini Theatres, Inc.,* 427 U. S. 50 (1976)). We have made clear that the lesser scrutiny afforded regulations targeting the secondary effects of crime or declining property values has no application to content-based regulations targeting the primary effects of protected speech. *Reno, supra,* at 867–868; *Boos,* 485 U. S., at 320–321. The statute now before us burdens speech because of its content; it must receive strict scrutiny.

There is, moreover, a key difference between cable television and the broadcasting media, which is the point on which this case turns: Cable systems have the capacity to block unwanted channels on a household-by-household basis. The option to block reduces the likelihood, so concerning to the Court in *Pacifica, supra,* at 744, that traditional First Amendment scrutiny would deprive the Government of all authority to address this sort of problem. The corollary, of course, is that targeted blocking enables the Government to support parental authority without affecting the First Amendment interests of speakers and willing listeners—listeners for whom, if the speech is unpopular or indecent, the privacy of their own homes may be the optimal place of receipt. Simply put, targeted blocking is less restrictive than banning, and the Government cannot ban speech if targeted blocking is a feasible and effective means of furthering its compelling interests. This is not to say that the absence of an effective blocking mechanism will in all cases suffice to support a law restricting the speech in question; but if a less restrictive means is available for the Government to achieve its goals, the Government must use it.

## III

The District Court concluded that a less restrictive alternative is available: § 504, with adequate publicity. 30 F. Supp. 2d, at 719–720. No one disputes that § 504, which requires cable operators to block undesired channels at individual households upon request, is narrowly tailored to the Government's goal of supporting parents who want those channels blocked. The question is whether § 504 can be effective.

When a plausible, less restrictive alternative is offered to a content-based speech restriction, it is the Government's obligation to prove that the alternative will be ineffective to achieve its goals. The Government has not met that burden here. In support of its position, the Government cites empirical evidence showing that § 504, as promulgated and implemented before trial, generated few requests for household-by-household blocking. Between March 1996 and May 1997, while the Government was enjoined from enforcing § 505, § 504 remained in operation. A survey of cable operators determined that fewer than 0.5% of cable subscribers requested full blocking during that time. *Id.,* at 712. The uncomfortable fact is that § 504 was the sole blocking regulation in effect for over a year; and the public greeted it with a collective yawn.

The District Court was correct to direct its attention to the import of this tepid response. Placing the burden of proof upon the Government, the District Court examined whether § 504 was capable of serving as an effective, less restrictive means of reaching the Government's goals. *Id.,* at 715, 718–719. It concluded that § 504, if publicized in an adequate manner, could be. *Id.,* at 719–720.

The District Court employed the proper approach. When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions. *Greater New Orleans Broadcasting Assn., Inc.* v. *United States,* 527 U. S. 173, 183 (1999) ("[T]he Government bears

the burden of identifying a substantial interest and justifying the challenged restriction"); *Reno*, 521 U. S., at 879 ("The breadth of this content-based restriction of speech imposes an especially heavy burden on the Government to explain why a less restrictive provision would not be as effective . . ."); *Edenfield* v. *Fane*, 507 U. S. 761, 770–771 (1993) ("[A] governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree"); *Board of Trustees of State Univ. of N. Y.* v. *Fox*, 492 U. S. 469, 480 (1989) ("[T]he State bears the burden of justifying its restrictions . . ."); *Tinker* v. *Des Moines Independent Community School Dist.*, 393 U. S. 503, 509 (1969) ("In order for the State . . . to justify prohibition of a particular expression of opinion, it must be able to show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint"). When the Government seeks to restrict speech based on its content, the usual presumption of constitutionality afforded congressional enactments is reversed. "Content-based regulations are presumptively invalid," *R. A. V.* v. *St. Paul*, 505 U. S. 377, 382 (1992), and the Government bears the burden to rebut that presumption.

This is for good reason. "[T]he line between speech unconditionally guaranteed and speech which may legitimately be regulated, suppressed, or punished is finely drawn." *Speiser* v. *Randall*, 357 U. S. 513, 525 (1958). Error in marking that line exacts an extraordinary cost. It is through speech that our convictions and beliefs are influenced, expressed, and tested. It is through speech that we bring those beliefs to bear on Government and on society. It is through speech that our personalities are formed and expressed. The citizen is entitled to seek out or reject certain ideas or influences without Government interference or control.

When a student first encounters our free speech jurisprudence, he or she might think it is influenced by the philosophy that one idea is as good as any other, and that in art and literature objective standards of style, taste, decorum, beauty, and esthetics are deemed by the Constitution to be inappropriate, indeed unattainable. Quite the opposite is true. The Constitution no more enforces a relativistic philosophy or moral nihilism than it does any other point of view. The Constitution exists precisely so that opinions and judgments, including esthetic and moral judgments about art and literature, can be formed, tested, and expressed. What the Constitution says is that these judgments are for the individual to make, not for the Government to decree, even with the mandate or approval of a majority. Technology expands the capacity to choose; and it denies the potential of this revolution if we assume the Government is best positioned to make these choices for us.

It is rare that a regulation restricting speech because of its content will ever be permissible. Indeed, were we to give the Government the benefit of the doubt when it attempted to restrict speech, we would risk leaving regulations in place that sought to shape our unique personalities or to silence dissenting ideas. When First Amendment compliance is the point to be proved, the risk of nonpersuasion—operative in all trials—must rest with the Government, not with the citizen. *Id.*, at 526.

With this burden in mind, the District Court explored three explanations for the lack of individual blocking requests. 30 F. Supp. 2d, at 719. First, individual blocking might not be an effective alternative, due to technological or other limitations. Second, although an adequately advertised blocking provision might have been effective, § 504 as written did not require sufficient notice to make it so. Third, the actual signal bleed problem might be far less of a concern than the Government at first had supposed. *Ibid.*

To sustain its statute, the Government was required to show that the first was the right answer. According to the District Court, however, the first and third possibilities were "equally consistent" with the record before it. *Ibid.* As for the second, the record was "not clear" as to whether enough notice had been issued to give § 504 a fighting chance. *Ibid.* The case, then, was at best a draw. Unless the District Court's findings are clearly erroneous, the tie goes to free expression.

The District Court began with the problem of signal bleed itself, concluding "the Government has not convinced us that [signal bleed] is a pervasive problem." *Id.*, at 708–709, 718. The District Court's thorough discussion exposes a central weakness in the Government's proof: There is little hard evidence of how widespread or how serious the problem of signal bleed is. Indeed, there is no proof as to how likely any child is to view a discernible explicit image, and no proof of the duration of the bleed or the quality of the pictures or sound. To say that millions of children are subject to a risk of viewing signal bleed is one thing; to avoid articulating the true nature and extent of the risk is quite another. Under § 505, sanctionable signal bleed can include instances as fleeting as an image appearing on a screen for just a few seconds. The First Amendment requires a more careful assessment and characterization of an evil in order to justify a regulation as sweeping as this. Although the parties have taken the additional step of lodging with the Court an assortment of videotapes, some of which show quite explicit bleeding and some of which show television static or snow, there is no attempt at explanation or context; there is no discussion, for instance, of the extent to which any particular tape is representative of what appears on screens nationwide.

The Government relied at trial on anecdotal evidence to support its regulation, which the District Court summarized as follows:

"The Government presented evidence of two city councillors, eighteen individuals, one United States Senator, and the officials of one city who complained either to their [cable operator], to their local Congressman, or to the FCC about viewing signal bleed on television. In each instance, the local [cable operator] offered to, or did in fact, rectify the situation for free (with the exception of 1 individual), with varying degrees of rapidity. Included in the complaints was the additional concern that other parents might not be aware that their children are exposed to this problem. In addition, the Government presented evidence of a child exposed to signal bleed at a friend's house. Cindy Omlin set the lockout feature on her remote control to prevent her child from tuning to adult channels, but her eleven year old son was nevertheless exposed to signal bleed when he attended a slumber party at a friend's house.

"The Government has presented evidence of only a handful of isolated incidents over the 16 years since 1982 when Playboy started broadcasting. The Government has not presented any survey-type evidence on the magnitude of the 'problem.'" *Id.*, at 709 (footnote and record citations omitted).

Spurred by the District Court's express request for more specific evidence of the problem, see 945 F. Supp., at 779, n. 16, the Government also presented an expert's spreadsheet estimate that 39 million homes with 29.5 million children had the potential to be exposed to signal bleed, 30 F. Supp. 2d, at 708–709. The Government made no attempt to confirm the accuracy of its estimate through surveys or other field tests, however. Accordingly, the District Court discounted the figures and made this finding: "[T]he Government presented no evidence on the number of households actually exposed to signal bleed and thus has not quantified the actual extent of the problem of signal bleed." *Id.*, at

709. The finding is not clearly erroneous; indeed it is all but required.

Once § 505 went into effect, of course, a significant percentage of cable operators felt it necessary to time channel their sexually explicit programmers. *Id.*, at 711, and n. 14. This is an indication that scrambling technology is not yet perfected. That is not to say, however, that scrambling is completely ineffective. Different cable systems use different scrambling systems, which vary in their dependability. "The severity of the problem varies from time to time and place to place, depending on the weather, the quality of the equipment, its installation, and maintenance." *Id.*, at 708. At even the good end of the spectrum a system might bleed to an extent sufficient to trigger the time-channeling requirement for a cautious cable operator. (The statute requires the signal to be *"fully* block[ed]." 47 U. S. C. § 561(a) (1994 ed., Supp. III) (emphasis added).) A rational cable operator, faced with the possibility of sanctions for intermittent bleeding, could well choose to time channel even if the bleeding is too momentary to pose any concern to most households. To affirm that the Government failed to prove the existence of a problem, while at the same time observing that the statute imposes a severe burden on speech, is consistent with the analysis our cases require. Here, there is no probative evidence in the record which differentiates among the extent of bleed at individual households and no evidence which otherwise quantifies the signal bleed problem.

In addition, market-based solutions such as programmable televisions, VCR's, and mapping systems (which display a blue screen when tuned to a scrambled signal) may eliminate signal bleed at the consumer end of the cable. 30 F. Supp. 2d, at 708. Playboy made the point at trial that the Government's estimate failed to account for these factors. *Id.*, at 708–709. Without some sort of field survey, it is impossible to know how widespread the problem in fact is, and the only indicator in the record is a handful of complaints. Cf.

*Turner Broadcasting System, Inc.* v. *FCC,* 520 U. S. 180, 187 (1997) (reviewing " 'a record of tens of thousands of pages' of evidence" developed through "three years of pre-enactment hearings, . . . as well as additional expert submissions, sworn declarations and testimony, and industry documents" in support of complex must-carry provisions). If the number of children transfixed by even flickering pornographic television images in fact reached into the millions we, like the District Court, would have expected to be directed to more than a handful of complaints.

No support for the restriction can be found in the near barren legislative record relevant to this provision. Section 505 was added to the Act by floor amendment, accompanied by only brief statements, and without committee hearing or debate. See 141 Cong. Rec. 15586–15589 (1995). One of the measure's sponsors did indicate she considered time channeling to be superior to voluntary blocking, which "put[s] the burden of action on the subscriber, not the cable company." *Id.,* at 15587 (statement of Sen. Feinstein). This sole conclusory statement, however, tells little about the relative efficacy of voluntary blocking versus time channeling, other than offering the unhelpful, self-evident generality that voluntary measures require voluntary action. The Court has declined to rely on similar evidence before. See *Sable Communications,* 492 U. S., at 129–130 ("[A]side from conclusory statements during the debates by proponents of the bill, . . . the congressional record presented to us contains no evidence as to *how* effective or ineffective the . . . regulations were or might prove to be" (footnote omitted)); *Reno,* 521 U. S., at 858, and n. 24, 875–876, n. 41 (same). This is not to suggest that a 10,000-page record must be compiled in every case or that the Government must delay in acting to address a real problem; but the Government must present more than anecdote and supposition. The question is whether an actual problem has been proved in this case. We agree that

the Government has failed to establish a pervasive, nationwide problem justifying its nationwide daytime speech ban.

Nor did the District Court err in its second conclusion. The Government also failed to prove § 504 with adequate notice would be an ineffective alternative to § 505. Once again, the District Court invited the Government to produce its proof. See 945 F. Supp., at 781 ("If the § 504 blocking option is not being promoted, it cannot become a meaningful alternative to the provisions of § 505. At the time of the permanent injunction hearing, further evidence of the actual and predicted impact and efficacy of § 504 would be helpful to us"). Once again, the Government fell short. See 30 F. Supp. 2d, at 719 ("[The Government's argument that § 504 is ineffective] is premised on adequate notice to subscribers. It is not clear, however, from the record that notices of the provisions of § 504 have been adequate"). There is no evidence that a well-promoted voluntary blocking provision would not be capable at least of informing parents about signal bleed (if they are not yet aware of it) and about their rights to have the bleed blocked (if they consider it a problem and have not yet controlled it themselves).

The Government finds at least two problems with the conclusion of the three-judge District Court. First, the Government takes issue with the District Court's reliance, without proof, on a "hypothetical, enhanced version of Section 504." Brief for Appellants 32. It was not the District Court's obligation, however, to predict the extent to which an improved notice scheme would improve § 504. It was for the Government, presented with a plausible, less restrictive alternative, to prove the alternative to be ineffective, and § 505 to be the least restrictive available means. Indeed, to the extent the District Court erred, it was only in attempting to implement the less restrictive alternative through judicial decree by requiring Playboy to provide for expanded notice in its cable service contracts. The appropriate remedy was not to repair the statute, it was to enjoin the speech restric-

tion. Given the existence of a less restrictive means, if the Legislature wished to improve its statute, perhaps in the process giving careful consideration to other alternatives, it then could do so.

The Government also contends a publicized § 504 will be just as restrictive as § 505, on the theory that the cost of installing blocking devices will outstrip the revenues from distributing Playboy's programming and lead to its cancellation. See 30 F. Supp. 2d, at 713. This conclusion rests on the assumption that a sufficient percentage of households, informed of the potential for signal bleed, would consider it enough of a problem to order blocking devices—an assumption for which there is no support in the record. *Id.*, at 719. It should be noted, furthermore, that Playboy is willing to incur the costs of an effective § 504. One might infer that Playboy believes an advertised § 504 will be ineffective for its object, or one might infer the company believes the signal bleed problem is not widespread. In the absence of proof, it is not for the Court to assume the former.

It is no response that voluntary blocking requires a consumer to take action, or may be inconvenient, or may not go perfectly every time. A court should not assume a plausible, less restrictive alternative would be ineffective; and a court should not presume parents, given full information, will fail to act. If unresponsive operators are a concern, moreover, a notice statute could give cable operators ample incentive, through fines or other penalties for noncompliance, to respond to blocking requests in prompt and efficient fashion.

Having adduced no evidence in the District Court showing that an adequately advertised § 504 would not be effective to aid desirous parents in keeping signal bleed out of their own households, the Government can now cite nothing in the record to support the point. The Government instead takes quite a different approach. After only an offhand suggestion that the success of a well-communicated § 504 is "highly

unlikely," the Government sets the point aside, arguing instead that society's independent interests will be unserved if parents fail to act on that information. Brief for Appellants 32–33 ("[U]nder . . . an enhanced version of Section 504, parents who had strong feelings about the matter could see to it that their children did not view signal bleed—at least in their own homes"); *id.,* at 33 ("Even an enhanced version of Section 504 would succeed in blocking signal bleed only if, and after, parents affirmatively decided to avail themselves of the means offered them to do so. There would certainly be parents—perhaps a large number of parents—who out of inertia, indifference, or distraction, simply would take no action to block signal bleed, even if fully informed of the problem and even if offered a relatively easy solution"); Reply Brief for Appellants 12 ("[Society's] interest would of course be served in instances . . . in which parents request blocking under an enhanced Section 504. But in cases in which parents fail to make use of an enhanced Section 504 procedure out of distraction, inertia, or indifference, Section 505 would be the only means to protect society's independent interest").

Even upon the assumption that the Government has an interest in substituting itself for informed and empowered parents, its interest is not sufficiently compelling to justify this widespread restriction on speech. The Government's argument stems from the idea that parents do not know their children are viewing the material on a scale or frequency to cause concern, or if so, that parents do not want to take affirmative steps to block it and their decisions are to be superseded. The assumptions have not been established; and in any event the assumptions apply only in a regime where the option of blocking has not been explained. The whole point of a publicized § 504 would be to advise parents that indecent material may be shown and to afford them an opportunity to block it at all times, even when they are not at home and even after 10 p.m. Time channeling does not offer this assistance. The regulatory alternative of a publi-

cized § 504, which has the real possibility of promoting more open disclosure and the choice of an effective blocking system, would provide parents the information needed to engage in active supervision. The Government has not shown that this alternative, a regime of added communication and support, would be insufficient to secure its objective, or that any overriding harm justifies its intervention.

There can be little doubt, of course, that under a voluntary blocking regime, even with adequate notice, some children will be exposed to signal bleed; and we need not discount the possibility that a graphic image could have a negative impact on a young child. It must be remembered, however, that children will be exposed to signal bleed under time channeling as well. Time channeling, unlike blocking, does not eliminate signal bleed around the clock. Just as adolescents may be unsupervised outside of their own households, it is hardly unknown for them to be unsupervised in front of the television set after 10 p.m. The record is silent as to the comparative effectiveness of the two alternatives.

\* \* \*

Basic speech principles are at stake in this case. When the purpose and design of a statute is to regulate speech by reason of its content, special consideration or latitude is not accorded to the Government merely because the law can somehow be described as a burden rather than outright suppression. We cannot be influenced, moreover, by the perception that the regulation in question is not a major one because the speech is not very important. The history of the law of free expression is one of vindication in cases involving speech that many citizens may find shabby, offensive, or even ugly. It follows that all content-based restrictions on speech must give us more than a moment's pause. If television broadcasts can expose children to the real risk of harmful exposure to indecent materials, even in their own home and without parental consent, there is a problem the

Government can address. It must do so, however, in a way consistent with First Amendment principles. Here the Government has not met the burden the First Amendment imposes.

The Government has failed to show that § 505 is the least restrictive means for addressing a real problem; and the District Court did not err in holding the statute violative of the First Amendment. In light of our ruling, it is unnecessary to address the second question presented: whether the District Court was divested of jurisdiction to consider the Government's postjudgment motions after the Government filed a notice of appeal in this Court. The judgment of the District Court is affirmed.

*It is so ordered.*

## APPENDIX TO OPINION OF THE COURT

Section 505 of the Telecommunications Act of 1996, Pub. L. 104–104, 110 Stat. 136, 47 U. S. C. § 561 (1994 ed., Supp. III), provides in relevant part:

"(a) Requirement

"In providing sexually explicit adult programming or other programming that is indecent on any channel of its service primarily dedicated to sexually-oriented programming, a multichannel video programming distributor shall fully scramble or otherwise fully block the video and audio portion of such channel so that one not a subscriber to such channel or programming does not receive it.

"(b) Implementation

"Until a multichannel video programming distributor complies with the requirement set forth in subsection (a) of this section, the distributor shall limit the access of children to the programming referred to in that subsection by not providing such programming during the hours of the day (as determined by the Commission)

when a significant number of children are likely to view it.

"(c) 'Scramble' defined

"As used in this section, the term 'scramble' means to rearrange the content of the signal of the programming so that the programming cannot be viewed or heard in an understandable manner."

Section 504 of the Telecommunications Act of 1996, Pub. L. 104–104, 110 Stat. 136, 47 U. S. C. § 560 (1994 ed., Supp. III), provides in relevant part:

"(a) Subscriber request

"Upon request by a cable service subscriber, a cable operator shall, without charge, fully scramble or otherwise fully block the audio and video programming of each channel carrying such programming so that one not a subscriber does not receive it.

"(b) 'Scramble' defined

"As used in this section, the term 'scramble' means to rearrange the content of the signal of the programming so that the programming cannot be viewed or heard in an understandable manner."

JUSTICE STEVENS, concurring.

Because JUSTICE SCALIA has advanced an argument that the parties have not addressed, a brief response is in order. Relying on *Ginzburg* v. *United States*, 383 U. S. 463 (1966), JUSTICE SCALIA would treat programs whose content is, he assumes, protected by the First Amendment as though they were obscene because of the way they are advertised. The four separate dissenting opinions in *Ginzburg*, authored by Justices Black, Harlan, Douglas, and Stewart, amply demonstrated the untenable character of the *Ginzburg* decision when it was rendered. The *Ginzburg* theory of obscenity is a legal fiction premised upon a logical bait and switch; adver-

tising a bareheaded dancer as "topless" might be deceptive, but it would not make her performance obscene.

As I explained in my dissent in *Splawn* v. *California*, 431 U. S. 595, 602 (1977), *Ginzburg* was decided before the Court extended First Amendment protection to commercial speech, *Virginia Bd. of Pharmacy* v. *Virginia Citizens Consumer Council, Inc.*, 425 U. S. 748 (1976). JUSTICE SCALIA's proposal is thus not only anachronistic, it also overlooks a key premise upon which our commercial speech cases are based. The First Amendment assumes that, as a general matter, "information is not in itself harmful, that people will perceive their own best interests if only they are well enough informed, and that the best means to that end is to open the channels of communication rather than to close them." *Id.*, at 770. The very fact that the programs marketed by Playboy are offensive to many viewers provides a justification for protecting, not penalizing, truthful statements about their content.

JUSTICE THOMAS, concurring.

It would seem to me that, with respect to at least some of the cable programming affected by § 505 of the Telecommunications Act of 1996, the Government has ample constitutional and statutory authority to prohibit its broadcast entirely. A governmental restriction on the distribution of obscene materials receives no First Amendment scrutiny. *Roth* v. *United States*, 354 U. S. 476, 485 (1957). Though perhaps not all of the programming at issue in the case is obscene as this Court defined the term in *Miller* v. *California*, 413 U. S. 15, 24 (1973), one could fairly conclude that, under the standards applicable in many communities, some of the programming meets the *Miller* test. If this is so, the Government is empowered by statute to sanction these broadcasts with criminal penalties. See 47 U. S. C. § 559 (1994 ed., Supp. III) ("Whoever transmits over any cable system any matter which is obscene or otherwise unprotected by the Constitu-

tion of the United States shall be,fined under title 18 or imprisoned not more than 2 years, or both").*

However, as the Court points out, this case has been litigated on the assumption that the programming at issue is *not* obscene, but merely indecent.   We have no factual finding that any of the materials at issue are, in fact, obscene. Indeed, the District Court described the materials as indecent but not obscene.   945 F. Supp. 772, 774, n. 4 (Del. 1996). The Government does not challenge that characterization in this Court, Tr. of Oral Arg. 9–10, but instead asks this Court to ratify the statute on the assumption that this is protected speech.   I am unwilling, in the absence of factual findings or advocacy of the position, to rely on the view that some of the relevant programming is obscene.

What remains then is the assumption that the programming restricted by § 505 is not obscene, but merely indecent. The Government, having declined to defend the statute as a regulation of obscenity, now asks us to dilute our stringent First Amendment standards to uphold § 505 as a proper regulation of protected (rather than unprotected) speech.   See Brief for Appellants 18–29 (arguing that traditional strict scrutiny does not apply).   I am unwilling to corrupt the First Amendment to reach this result.   The "starch" in our constitutional standards cannot be sacrificed to accommodate the enforcement choices of the Government.   See *Denver Area Ed. Telecommunications Consortium, Inc.* v. *FCC,* 518 U. S. 727, 774 (1996) (SOUTER, J., concurring) ("Reviewing

*I am referring, here, to unscrambled programming on the Playboy and Spice channels, examples of which were lodged with the Court.   The Government also lodged videotapes containing signal bleed from these channels.   I assume that if the unscrambled programming on these channels is obscene, any scrambled but discernible images from the programs would be obscene as well.   In fact, some of the examples of signal bleed contained in the record may fall within our definition of obscenity more easily than would the unscrambled programming because it is difficult to dispute that signal bleed "lacks serious literary, artistic, political, or scientific value."   *Miller* v. *California,* 413 U. S. 15, 24 (1973).

speech regulations under fairly strict categorical rules keeps the starch in the standards for those moments when the daily politics cries loudest for limiting what may be said"). Applying the First Amendment's exacting standards, the Court has correctly determined that § 505 cannot be upheld on the theory argued by the Government. Accordingly, I join the opinion of the Court.

JUSTICE SCALIA, dissenting.

I agree with the principal dissent in this case that § 505 of the Telecommunications Act of 1996, Pub. L. 104–104, 110 Stat. 136, 47 U. S. C. § 561 (1994 ed., Supp. III), is supported by a compelling state interest and is narrowly tailored. I write separately to express my view that § 505 can be upheld in simpler fashion: by finding that it regulates the business of obscenity.

To be sure, § 505 and the Federal Communications Commission's implementing regulation, see 47 CFR § 76.227 (1999), purport to capture programming that is indecent rather than merely that which is obscene. And I will assume for purposes of this discussion (though it is a highly fanciful assumption) that none of the transmissions at issue independently crosses the boundary we have established for obscenity, see *Miller* v. *California,* 413 U. S. 15, 24 (1973), so that the individual programs themselves would enjoy First Amendment protection. In my view, however, that assumption does not put an end to the inquiry.

We have recognized that commercial entities which engage in "the sordid business of pandering" by "deliberately emphasiz[ing] the sexually provocative aspects of [their nonobscene products], in order to catch the salaciously disposed," engage in constitutionally unprotected behavior. *Ginzburg* v. *United States,* 383 U. S. 463, 467, 472 (1966); see also *FW/ PBS, Inc.* v. *Dallas,* 493 U. S. 215, 257–258 (1990) (SCALIA, J., concurring in part and dissenting in part); *Pinkus* v. *United States,* 436 U. S. 293, 303–304 (1978); *Splawn* v. *California,*

431 U. S. 595, 597–599 (1977); *Hamling* v. *United States,* 418 U. S. 87, 130 (1974). Cf. *Jacobellis* v. *Ohio,* 378 U. S. 184, 201 (1964) (Warren, C. J., dissenting) ("In my opinion, the use to which various materials are put—not just the words and pictures themselves—must be considered in determining whether or not the materials are obscene"). This is so whether or not the products in which the business traffics independently meet the high hurdle we have established for delineating the obscene, viz., that they contain no "serious literary, artistic, political, or scientific value." *Miller, supra,* at 24. See *Ginzburg,* 383 U. S., at 471. We are more permissive of government regulation in these circumstances because it is clear from the context in which exchanges between such businesses and their customers occur that neither the merchant nor the buyer is interested in the work's literary, artistic, political, or scientific value. "The deliberate representation of petitioner's publications as erotically arousing . . . stimulate[s] the reader to accept them as prurient; he looks for titillation, not for saving intellectual content." *Id.,* at 470. Thus, a business that "(1) offer[s] . . . hardcore sexual material, (2) as a constant and intentional objective of [its] business, [and] (3) seek[s] to promote it as such" finds no sanctuary in the First Amendment. *FW/PBS, supra,* at 261 (SCALIA J., concurring in part and dissenting in part).

Section 505 regulates just this sort of business. Its coverage is limited to programming that "describes or depicts sexual or excretory activities or organs *in a patently offensive manner* as measured by contemporary community standards [for cable television]." 47 CFR § 76.227(d) (1999) (emphasis added). It furthermore applies only to those channels that are *"primarily dedicated* to sexually-oriented programming." [1] § 505(a) (emphasis added). It is conceivable, I suppose, that a channel which is primarily dedicated to sex

---

[1] Congress's attempt to limit the reach of § 505 is therefore, contrary to the Court's contention, see *ante,* at 812, a virtue rather than a vice.

might not *hold itself forth* as primarily dedicated to sex—in which case its productions which contain "serious literary, artistic, political, or scientific value" (if any) would be as entitled to First Amendment protection as the statuary rooms of the National Gallery. But in the competitive world of cable programming, the possibility that a channel devoted to sex would not advertise itself as such is sufficiently remote, and the number of such channels sufficiently small (if not indeed nonexistent), as not to render the provision substantially overbroad.[2]

Playboy itself illustrates the type of business §505 is designed to reach. Playboy provides, through its networks—Playboy Television, AdulTVision, Adam & Eve, and Spice—

---

[2] JUSTICE STEVENS misapprehends in several respects the nature of the test I would apply. First, he mistakenly believes that the nature of the advertising controls the obscenity analysis, regardless of the nature of the material being advertised. I entirely agree with him that "advertising a bareheaded dancer as 'topless' might be deceptive, but it would not make her performance obscene." *Ante,* at 828–829 (concurring opinion). I believe, however, that *if* the material is "patently offensive" *and* it is being advertised as such, we have little reason to think it is being proffered for its socially redeeming value.

JUSTICE STEVENS's second misapprehension flows from the first: He sees the test I would apply as incompatible with the Court's commercial-speech jurisprudence. See *ante,* at 829 (concurring opinion); see also *Splawn* v. *California,* 431 U. S. 595, 603, n. 2 (1977) (STEVENS, J., dissenting) ("*Ginzburg* cannot survive [*Virginia Bd. of Pharmacy* v. *Virginia Citizens Consumer Council, Inc.,* 425 U. S. 748 (1976)]"). There is no such conflict. Although the *Ginzburg* test, like most obscenity tests, has ordinarily been applied in a commercial context (most purveyors of obscenity are in the business for the money), its logic is not restricted to that context. The test applies equally to the improbable case in which a collector of indecent materials wishes to give them away, and takes out a classified ad in the local newspaper touting their salacious appeal. Commercial motive or not, the "'[c]ircumstances of . . . dissemination are relevant to determining whether [the] social importance claimed for [the] material [is] . . . pretense or reality.'" *Splawn, supra,* at 598 (quoting jury instruction approved). Perhaps this is why the Court in *Splawn* did not accept JUSTICE STEVENS's claim of incompatibility.

"virtually 100% sexually explicit adult programming." 30 F. Supp. 2d 702, 707 (Del. 1998). For example, on its Spice network, Playboy describes its own programming as depicting such activities as "female masturbation/external," "girl/girl sex," and "oral sex/cunnilingus." 1 Record, Exh. 73, p. TWC00132. As one would expect, given this content, Playboy advertises accordingly, with calls to "Enjoy the sexiest, hottest adult movies in the privacy of your own home." 6 id., Exh. 136, at 2P009732. An example of the promotion for a particular movie is as follows: "Little miss country girls are aching for a quick roll in the hay! Watch southern hospitality pull out all the stops as these ravin' nymphos tear down the barn and light up the big country sky." 7 id., Exh. 226, at 2P009187. One may doubt whether—or marvel that—this sort of embarrassingly juvenile promotion really attracts what Playboy assures us is an "adult" audience. But it is certainly marketing sex.[3]

Thus, while I agree with JUSTICE BREYER's child-protection analysis, it leaves me with the same feeling of

---

[3] Both the Court, see *ante*, at 811, and JUSTICE THOMAS, see *ante*, at 830 (concurring opinion), find great importance in the fact that "this case has been litigated on the assumption that the programming at issue is not obscene, but merely indecent," see *ibid.* (emphasis deleted). But as I noted in *FW/PBS, Inc. v. Dallas*, 493 U. S. 215, 262–263 (1990) (opinion concurring in part and dissenting in part), we have not allowed the parties' litigating positions to place limits upon our development of obscenity law. See, *e. g.*, *Miller v. California*, 413 U. S. 15, 24–25 (1973) (abandoning "utterly without redeeming social value" test *sua sponte*); *Ginzburg v. United States*, 383 U. S. 463 (1966) (adopting pandering theory unargued by the Government); *Mishkin v. New York*, 383 U. S. 502 (1966) (upholding convictions on theory that obscenity could be defined by looking to the intent of the disseminator, despite respondent's express disavowal of that theory). As for JUSTICE THOMAS's concern that there has been no factual finding of obscenity in this case, see *ante*, at 830 (concurring opinion): This is not an as-applied challenge, in which the issue is whether a particular course of conduct constitutes obscenity; it is a facial challenge, in which the issue is whether the terms of this statute address obscenity. That is not for the factfinder below, but for this Court.

true-but-inadequate as the conclusion that Al Capone did not accurately report his income. It is not only children who can be protected from occasional uninvited exposure to what appellee calls "adult-oriented programming"; we can all be. Section 505 covers only businesses that engage in the "commercial exploitation of erotica solely for the sake of their prurient appeal," *Ginzburg*, 383 U. S., at 466—which, as Playboy's own advertisements make plain, is what "adult" programming is all about. In most contexts, contemporary American society has chosen to permit such commercial exploitation. That may be a wise democratic choice, if only because of the difficulty in many contexts (though not this one) of identifying the panderer to sex. It is, however, not a course compelled by the Constitution. Since the Government is entirely free to *block* these transmissions, it may certainly take the less drastic step of dictating how, and during what times, they may occur.

JUSTICE BREYER, with whom THE CHIEF JUSTICE, JUSTICE O'CONNOR, and JUSTICE SCALIA join, dissenting.

This case involves the application, not the elucidation, of First Amendment principles. We apply established First Amendment law to a statute that focuses upon the broadcast of "sexually explicit adult programming" on AdulTVision, Adam & Eve, Spice, and Playboy cable channels. These channels are, as the statute requires, "primarily dedicated to sexually-oriented programming." Telecommunications Act of 1996, Pub. L. 104–104, §505(a), 110 Stat. 136, 47 U. S. C. §561(a) (1994 ed., Supp. III). Section 505 prohibits cable operators from sending these adult channels into the homes of viewers who do not request them. In practice, it requires a significant number of cable operators either to upgrade their scrambling technology or to avoid broadcasting these channels during daylight and evening hours (6 a.m. to 10 p.m.). We must decide whether the First Amendment permits Congress to enact this statute.

The basic, applicable First Amendment principles are not at issue. The Court must examine the statute before us with great care to determine whether its speech-related restrictions are justified by a "compelling interest," namely, an interest in limiting children's access to sexually explicit material. In doing so, it recognizes that the Legislature must respect adults' viewing freedom by "narrowly tailoring" the statute so that it restricts no more speech than necessary, and choosing instead any alternative that would further the compelling interest in a "less restrictive" but "at least as effective" way. See *ante*, at 813; *Reno* v. *American Civil Liberties Union*, 521 U. S. 844, 874 (1997).

Applying these principles, the majority invalidates § 505 for two reasons. It finds that (1) the "Government has failed to establish a pervasive, nationwide problem justifying its nationwide daytime speech ban," *ante*, at 823, and (2) the "Government . . . failed to prove" the "ineffective[ness]" of an alternative, namely, notified viewers requesting that the broadcaster of sexually explicit material stop sending it, *ibid.* In my view, the record supports neither reason.

## I

At the outset, I would describe the statutory scheme somewhat differently than does the majority. I would emphasize three background points. First, the statutory scheme reflects more than a congressional effort to control incomplete scrambling. Previously, federal law had left cable operators free to decide whether, when, and how to transmit adult channels. Most channel operators on their own had decided not to send adult channels into a subscriber's home except on request. But the operators then implemented that decision with inexpensive technology. Through signal "bleeding," the scrambling technology (either inadvertently or by way of enticement) allowed nonsubscribers to see and hear what was going on. That is why Congress decided to act.

In 1995, Senator Dianne Feinstein, the present statute's legislative cosponsor, pointed out that "numerous cable operators across the country are still automatically broadcasting sexually explicit programming into households across America, regardless of whether parents want this or subscribers want it." 141 Cong. Rec. 15588. She complained that the "industry has only taken baby steps to address this problem through voluntary policies that simply recommend action," *ibid.*, adding that the "problem is that there are no uniform laws or regulations that govern such sexually explicit adult programming on cable television," *id.*, at 15587. She consequently proposed, and Congress enacted, the present statute.

The statute is carefully tailored to respect viewer preferences. It regulates transmissions by creating two "default rules" applicable unless the subscriber decides otherwise. Section 504 requires a cable operator to "fully scramble" any channel (whether or not it broadcasts adult programming) *if* a subscriber asks *not* to receive it. Section 505 requires a cable operator to "fully scramble" every adult channel *unless* a subscriber asks to receive it. Taken together, the two provisions create a scheme that permits subscribers to choose to see what they want. But each law creates a different "default" assumption about silent subscribers. Section 504 assumes a silent subscriber wants to see the ordinary (non-adult) channels that the cable operator includes in the paid-for bundle sent into the home. Section 505 assumes that a silent subscriber does not want to receive adult channels. Consequently, a subscriber wishing to view an adult channel must "opt in," and specifically request that channel. See § 505. A subscriber wishing not to view any other channel (sent into the home) must "opt out." See § 504.

The scheme addresses signal bleed but only indirectly. From the statute's perspective signal "bleeding"—*i. e.*, a failure to fully "rearrange the content of the signal . . . so that the programming cannot be viewed or heard in an under-

standable manner," § 504(c)—amounts to transmission into a home. Hence "bleeding" violates the statute whenever a clear transmission of an unrequested adult channel would violate the statute.

Second, the majority's characterization of this statutory scheme as "prohibit[ing] . . . speech" is an exaggeration. *Ante*, at 812. Rather, the statute places a *burden* on adult channel speech by requiring the relevant cable operator either to use better scrambling technology, or, if that technology is too expensive, to broadcast only between 10 p.m. and 6 a.m. Laws that burden speech, say, by making speech less profitable, may create serious First Amendment issues, but they are not the equivalent of an absolute ban on speech itself. Cf. *Nixon* v. *Shrink Missouri Government PAC*, 528 U. S. 377 (2000). Thus, this Court has upheld laws that do not ban the access of adults to sexually explicit speech, but burden that access through geographical or temporal zoning. See, *e. g., Renton* v. *Playtime Theatres, Inc.*, 475 U. S. 41 (1986); *FCC* v. *Pacifica Foundation*, 438 U. S. 726 (1978); *Young* v. *American Mini Theatres, Inc.*, 427 U. S. 50 (1976). This Court has also recognized that material the First Amendment guarantees adults the right to see may not be suitable for children. And it has consequently held that legislatures maintain a limited power to protect children by restricting access to, but not banning, adult material. Compare *Ginsberg* v. *New York*, 390 U. S. 629 (1968) (upholding ban on sale of pornographic magazines to minors), with *Butler* v. *Michigan*, 352 U. S. 380 (1957) (invalidating ban on all books unfit for minors); see also *Denver Area Ed. Telecommunications Consortium, Inc.* v. *FCC*, 518 U. S. 727, 737–753 (1996) (plurality opinion); *Pacifica Foundation, supra*, at 748–750; *Reno, supra*, at 887–889 (O'CONNOR, J., concurring in part and dissenting in part). The difference—between imposing a burden and enacting a ban—can matter even when strict First Amendment rules are at issue.

Third, this case concerns only the regulation of commercial actors who broadcast "virtually 100% sexually explicit" material. 30 F. Supp. 2d 702, 707 (Del. 1998). The channels do not broadcast more than trivial amounts of more serious material such as birth control information, artistic images, or the visual equivalents of classical or serious literature. This case therefore does not present the kind of narrow tailoring concerns seen in other cases. See, e. g., Reno, 521 U. S., at 877–879 ("The breadth of the [statutue's] coverage is wholly unprecedented. . . . [It] cover[s] large amounts of nonpornographic material with serious educational or other value"); Butler, supra, at 381–384 (invalidating ban on books " 'tending to the corruption of the morals of youth' ").

With this background in mind, the reader will better understand my basic disagreement with each of the Court's two conclusions.

## II

The majority first concludes that the Government failed to prove the seriousness of the problem—receipt of adult channels by children whose parents did not request their broadcast. Ante, at 819–822. This claim is flat-out wrong. For one thing, the parties concede that basic RF scrambling does not scramble the audio portion of the program. 30 F. Supp. 2d, at 707. For another, Playboy itself conducted a survey of cable operators who were asked: "Is your system in full compliance with Section 505 (no discernible audio or video bleed)?" To this question, 75% of cable operators answered "no." See Def. Exh. 254, 2 Record 2. Further, the Government's expert took the number of homes subscribing to Playboy or Spice, multiplied by the fraction of cable households with children and the average number of children per household, and found 29 million children are potentially exposed to audio and video bleed from adult programming. Def. Exh. 82, 10 Record 11–12. Even discounting by 25% for systems that might be considered in full compliance, this left 22

million children in homes with faulty scrambling systems. See *id.*, at 12. And, of course, the record contains additional anecdotal evidence and the concerns expressed by elected officials, probative of a larger problem. See 30 F. Supp. 2d, at 709, and n. 10; see also 141 Cong. Rec. 15586 (1995).

I would add to this empirical evidence the majority's own statement that *"most* cable operators had 'no practical choice but to curtail'" adult programming by switching to night-time only transmission of adult channels. *Ante,* at 809 (emphasis added) (quoting 30 F. Supp. 2d, at 711). *If signal bleed is not a significant empirical problem, then why, in light of the cost of its cure, must so many cable operators switch to nighttime hours?* There is no realistic answer to this question. I do not think it realistic to imagine that signal bleed occurs just enough to make cable operators skittish, without also significantly exposing children to these images. See *ante,* at 821.

If, as the majority suggests, the signal bleed problem is not significant, then there is also no significant burden on speech created by § 505. The majority cannot have this evidence both ways. And if, given this logical difficulty and the quantity of empirical evidence, the majority still believes that the Government has not proved its case, then it imposes a burden upon the Government beyond that suggested in any other First Amendment case of which I am aware.

### III

The majority's second claim—that the Government failed to demonstrate the absence of a "less restrictive alternative"—presents a closer question. The specific question is whether § 504's "opt-out" amounts to a "less restrictive," but *similarly* practical and *effective,* way to accomplish § 505's child-protecting objective. As *Reno* tells us, a "less restrictive alternativ[e]" must be "at least as effective in achieving the legitimate purpose that the statute was enacted to serve." 521 U. S., at 874.

The words I have just emphasized, "similarly" and "effective," are critical. In an appropriate case they ask a judge not to apply First Amendment rules mechanically, but to decide whether, in light of the benefits and potential alternatives, the statute works speech-related harm (here to adult speech) out of proportion to the benefits that the statute seeks to provide (here, child protection).

These words imply a degree of leeway, however small, for the Legislature when it chooses among possible alternatives in light of predicted comparative effects. Without some such empirical leeway, the undoubted ability of lawyers and judges to imagine *some* kind of slightly less drastic or restrictive an approach would make it impossible to write laws that deal with the harm that called the statute into being. As Justice Blackmun pointed out, a "judge would be unimaginative indeed if he could not come up with something a little less 'drastic' or a little less 'restrictive' in almost any situation, and thereby enable himself to vote to strike legislation down." *Illinois Bd. of Elections* v. *Socialist Workers Party*, 440 U. S. 173, 188–189 (1979) (concurring opinion). Used without a sense of the practical choices that face legislatures, "the test merely announces an inevitable [negative] result, and the test is no test at all." *Id.*, at 188.

The majority, in describing First Amendment jurisprudence, scarcely mentions the words "at least as effective"— a rather surprising omission since they happen to be what this case is all about. But the majority does refer to *Reno's* understanding of less restrictive alternatives, *ante*, at 813, and it addresses the Government's effectiveness arguments, *ante*, at 823–826. I therefore assume it continues to recognize their role as part of the test that it enunciates.

I turn then to the major point of disagreement. Unlike the majority, I believe the record makes clear that § 504's opt-out is not a similarly effective alternative. Section 504 (opt-out) and § 505 (opt-in) work differently in order to achieve very different legislative objectives. Section 504

gives parents the power to tell cable operators to keep any channel out of their home. Section 505 does more. Unless parents explicitly consent, it inhibits the transmission of adult cable channels to children whose parents may be unaware of what they are watching, whose parents cannot easily supervise television viewing habits, whose parents do not know of their § 504 "opt-out" rights, or whose parents are simply unavailable at critical times. In this respect, § 505 serves the same interests as the laws that deny children access to adult cabarets or X-rated movies. *E. g.,* Del. Code Ann., Tit. 11, § 1365(i)(2) (1995); D. C. Code Ann. § 22–2001(b)(1)(B) (1996). These laws, and § 505, all act in the absence of direct parental supervision.

This legislative objective is perfectly legitimate. Where over 28 million school age children have both parents or their only parent in the work force, where at least 5 million children are left alone at home without supervision each week, and where children may spend afternoons and evenings watching television outside of the home with friends, § 505 offers independent protection for a large number of families. See U. S. Dept. of Education, Office of Research and Improvement, Bringing Education into the After-School Hours 3 (summer 1999). I could not disagree more when the majority implies that the Government's independent interest in offering such protection—preventing, say, an 8-year-old child from watching virulent pornography without parental consent—might not be "compelling." *Ante,* at 825. No previous case in which the protection of children was at issue has suggested any such thing. Indeed, they all say precisely the opposite. See *Reno, supra,* at 865 (State has an "independent interest in the well-being of its youth"); *Denver Area,* 518 U. S., at 743; *New York v. Ferber,* 458 U. S. 747, 756–757 (1982); *Ginsberg,* 390 U. S., at 640; *Prince v. Massachusetts,* 321 U. S. 158, 165 (1944). They make clear that Government has a compelling interest in helping parents by preventing

minors from accessing sexually explicit materials in the absence of parental supervision. See *Ginsberg, supra,* at 640.

By definition, § 504 does *nothing at all* to further the compelling interest I have just described. How then is it a similarly effective § 505 alternative?

The record, moreover, sets forth empirical evidence showing that the two laws are not equivalent with respect to the Government's objectives. As the majority observes, during the 14 months the Government was enjoined from enforcing § 505, "fewer than 0.5% of cable subscribers requested full blocking" under § 504. *Ante,* at 816. The majority describes this public reaction as "a collective yawn," *ibid.,* adding that the Government failed to prove that the "yawn" reflected anything other than the lack of a serious signal bleed problem or a lack of notice which better information about § 504 might cure. The record excludes the first possibility— at least in respect to exposure, as discussed above. See *supra,* at 839–840. And I doubt that the public, though it may well consider the viewing habits of *adults* a matter of personal choice, would "yawn" when the exposure in question concerns young children, the absence of parental consent, and the sexually explicit material here at issue. See *ante,* at 833–834 (SCALIA, J., dissenting).

Neither is the record neutral in respect to the curative power of better notice. Section 504's opt-out right works only when parents (1) become aware of their § 504 rights, (2) discover that their children are watching sexually explicit signal "bleed," (3) reach their cable operator and ask that it block the sending of its signal to their home, (4) await installation of an individual blocking device, and, perhaps (5) (where the block fails or the channel number changes) make a new request. Better notice of § 504 rights does little to help parents discover their children's viewing habits (step 2). And it does nothing at all in respect to steps 3 through 5. Yet the record contains considerable evidence that those problems matter, *i. e.,* evidence of endlessly delayed phone

call responses, faulty installations, blocking failures, and other mishaps, leaving those steps as significant § 504 obstacles. See, e. g., Deposition of J. Cavalier in Civ. Action No. 96–94, pp. 17–18 (D. Del., Dec. 5, 1997) ("It's like calling any utilities; you sit there, and you wait and wait on the phone . . . . [It took] [t]hree weeks, numerous phone calls. . . . [E]very time I call Cox Cable . . . I get different stories"); Telephonic Deposition of M. Bennett, id., at 10–11 (D. Del., Dec. 9, 1997) ("After two [failed installations,] no, I don't recall calling them again. I just said well, I guess this is something I'm going to have to live with").

Further, the District Court's actual plan for "better notice"—the only plan that makes concrete the majority's "better notice" requirement—is fraught with difficulties. The District Court ordered Playboy to insist that cable operators place notice of § 504 in "inserts in monthly billing statements, barker channels . . . and on-air advertising." 30 F. Supp. 2d, at 719. But how can one say that placing one more insert in a monthly billing statement stuffed with others, or calling additional attention to adult channels through a "notice" on "barker" channels, will make more than a small difference? More importantly, why would doing so not interfere to some extent with the cable operators' own freedom to decide what to broadcast? And how is the District Court to supervise the contracts with thousands of cable operators that are to embody this requirement?

Even if better notice did adequately inform viewers of their § 504 rights, exercise of those rights by more than 6% of the subscriber base would itself raise Playboy's costs to the point that Playboy would be forced off the air entirely, 30 F. Supp. 2d, at 713—a consequence that would not seem to further anyone's interest in free speech. The majority, resting on its own earlier conclusion that signal bleed is not widespread, denies any likelihood that more than 6% of viewers would need § 504. But that earlier conclusion is unsound. See supra, at 839–840. The majority also relies on

the fact that Playboy, presumably aware of its own economic interests, "is willing to incur the costs of an effective § 504." *Ante,* at 824. Yet that denial, as the majority admits, may simply reflect Playboy's knowledge that § 504, even with better notice, will not work. Section 504 is not a similarly effective alternative to § 505 (in respect to the Government's interest in protecting children), unless more than a minimal number of viewers actually use it; yet the economic evidence shows that if more than 6% do so, Playboy's programming would be totally eliminated. The majority provides no answer to this argument in its opinion—and this evidence is sufficient in and of itself to dispose of this case.

Of course, it is logically *possible* that "better notice" will bring about near perfect parental knowledge (of what children watch and § 504 opt-out rights), that cable operators will respond rapidly to blocking requests, and that still 94% of all informed parents will decided not to have adult channels blocked for free. But the *probability* that this remote *possibility* will occur is neither a "draw" nor a "tie." *Ante,* at 819. And that fact is sufficient for the Government to have met its burden of proof.

All these considerations show that § 504's opt-out, even with the Court's plan for "better notice," is *not* similarly effective in achieving the legitimate goals that the statute was enacted to serve.

## IV

Section 505 raises the cost of adult channel broadcasting. In doing so, it restricts, but does not ban, adult speech. Adults may continue to watch adult channels, though less conveniently, by watching at night, recording programs with a VCR, or by subscribing to digital cable with better blocking systems. Cf. *Renton,* 475 U. S., at 53–55 (upholding zoning rules that force potential adult theater patrons to travel to less convenient locations). The Government's justification for imposing this restriction—limiting the access of children to channels that broadcast virtually 100% "sexu-

ally explicit" material—is "compelling." The record shows no similarly effective, less restrictive alternative. Consequently § 505's restriction, viewed in light of the proposed alternative, is proportionate to need. That is to say, it restricts speech no more than necessary to further that compelling need. Taken together, these considerations lead to the conclusion that § 505 is lawful.

I repeat that my disagreement with the majority lies in the fact that, in my view, the Government has satisfied its burden of proof. In particular, it has proved both the existence of a serious problem and the comparative ineffectiveness of § 504 in resolving that problem. This disagreement is not about allocation of First Amendment burdens of proof, basic First Amendment principle, nor the importance of that Amendment to our scheme of Government. See *ante*, at 826–827. First Amendment standards are rigorous. They safeguard speech. But they also permit Congress to enact a law that increases the costs associated with certain speech, where doing so serves a compelling interest that cannot be served through the adoption of a less restrictive, similarly effective alternative. Those standards at their strictest make it difficult for the Government to prevail. But they do not make it impossible for the Government to prevail.

The majority here, however, has applied those standards without making a realistic assessment of the alternatives. It thereby threatens to leave Congress without power to help the millions of parents who do not want to expose their children to commercial pornography—but will remain ill served by the Court's chosen remedy. Worse still, the logic of the majority's "505/504" comparison (but not its holding that the problem has not been established) would seem to apply whether "bleeding" or totally unscrambled transmission is at issue. If so, the public would have to depend solely upon the voluntary conduct of cable channel operators to avert considerably greater harm.

Case law does not mandate the Court's result. To the contrary, as I have pointed out, our prior cases recognize that, where the protection of children is at issue, the First Amendment poses a barrier that properly is high, but not insurmountable. It is difficult to reconcile today's decision with our foundational cases that have upheld similar laws, such as *FCC* v. *Pacifica Foundation*, 438 U. S. 726 (1978), and *Ginsberg* v. *New York*, 390 U. S. 629 (1968). It is not difficult to distinguish our cases striking down such laws— either because they applied far more broadly than the narrow regulation of adult channels here, see, *e. g., Reno* v. *American Civil Liberties Union*, 521 U. S. 844 (1997), imposed a total ban on a form of adult speech, see, *e. g., Sable Communications of Cal., Inc.* v. *FCC*, 492 U. S. 115 (1989); *Bolger* v. *Youngs Drug Products Corp.*, 463 U. S. 60 (1983), or because a less restrictive, similarly effective alternative was otherwise available, see, *e. g., Denver Area*, 518 U. S., at 753–760.

Nor is it a satisfactory answer to say, as does JUSTICE THOMAS, that the Government remains free to prosecute under the obscenity laws. *Ante*, at 829–830. The obscenity exception permits censorship of communication even among *adults*. See, *e. g., Miller* v. *California*, 413 U. S. 15 (1973). It must be kept narrow lest the Government improperly interfere with the communication choices that adults have freely made. To rely primarily upon law that bans speech for adults is to overlook the special need to protect children.

Congress has taken seriously the importance of maintaining adult access to the sexually explicit channels here at issue. It has tailored the restrictions to minimize their impact upon adults while offering parents help in keeping unwanted transmissions from their children. By finding "adequate alternatives" where there are none, the Court reduces Congress' protective power to the vanishing point. That is not what the First Amendment demands.

I respectfully dissent.