**Anthony Joseph VONO, d/b/a Specialty Promotions, Plaintiff,**

v.

**Michael P. LEWIS, individually and in his official capacity as Director, State of Rhode Island Department of Transportation, Defendant.**

C.A. No. 05–485 S.

United States District Court, D. Rhode Island.

Jan. 27, 2009.

John William Dineen, Providence, RI, for Plaintiff.

John J. Igliozzi, R.I. Department of Transportation, Michael W. Field, Rebecca Tedford Partington, Attorney General's Office, Providence, RI, for Defendant.

**1.** Originally, Plaintiff named then-Director Capaldi. Jerome F. Williams was subsequently substituted as a defendant when he became Director. However, the Court notes the Department's current director is Michael P. Lewis, who will now be substituted as the Defendant. *See* Fed.R.Civ.P. 25(d).

## OPINION AND ORDER

WILLIAM E. SMITH, District Judge.

This civil rights action brought pursuant to 42 U.S.C. § 1983 challenges the constitutionality of the Rhode Island Outdoor Advertising Act ("RIOAA"), which regulates billboard advertising in the vicinity of interstate highways. The case has its genesis in an attempt by the Rhode Island Department of Transportation ("RIDOT" or "Department") to force the Plaintiff, Anthony J. Vono, the operator a small business close to the busy intersection of Interstates 95 and 195 in Providence, to remove a billboard advertisement. RIDOT has determined Vono's billboard to be non-compliant with the RIOAA because it advertises a service or product that is not sold on the premises.

After negotiations between Vono and the RIDOT wound up in the breakdown lane, Vono filed this lawsuit against the RIDOT and its then Director, James R. Capaldi[1], alleging that the statute and its implementing regulations violated the First Amendment.[2]

The RIOAA is a vestige of the 1960s era effort to "beautify" the expanding interstate highway system by limiting the proliferation of billboards. It generally prohibits outdoor advertising, but creates a number of exceptions for specific types of signs. The enforcement of one of those exceptions—the so-called on-premises exception—is at issue in this case. Because the exception for on-premises activities is essentially a content-based restriction, it violates the First Amendment of the United States Constitution. As the discussion

**2.** *See Schneider v. New Jersey,* 308 U.S. 147, 160, 60 S.Ct. 146, 84 L.Ed. 155 (1939) (First Amendment applicable to the states by operation of Fourteenth Amendment).

below makes clear, however, the road of First Amendment jurisprudence that leads to this door is long and winding,[3] and while the constitutional flaw is serious, the highway to a legislative cure (adopted by many states) is well marked and carefree if the Rhode Island General Assembly (and/or the RIDOT) were to choose to slip away on it.[4]

## I. Factual Background

The facts are undisputed.[5] Plaintiff, through his sole proprietorship, Specialty Promotions, designs and creates promotional and marketing materials such as T-shirts and cups. Plaintiff leases space in a commercial property zoned for industrial use located at 101 Poe Street in Providence.[6] The lease allows Plaintiff to use the property's rooftop outdoor advertising sign (i.e., a billboard). The sign is visible from the northbound lanes of Interstate 95, immediately south of the junction with Interstate 195. In the course of his business, Plaintiff designs advertisements that appear on the sign. Plaintiff also arranges to have specialty items such as the aforementioned T-shirts and cups, as well as other items such as pens and hats, printed by outside vendors. The specialty items are often imprinted with the same advertising logo displayed on the sign. Since 2002, when Plaintiff began to make use of the sign, he has displayed advertising for several clients, including the Providence Tourism Council, Blockbuster Video, and other commercial and noncommercial entities.

On July 7, 2005, Plaintiff received a letter from the Department's Office of Legal Counsel notifying him that the sign violated the prohibition against "off-premise" signs. A flurry of correspondence followed in which the Department declared the sign to be a public nuisance. Plaintiff then unsuccessfully attempted to alter the sign to satisfy the demand that it be used only as an on-premise sign.

An informal resolution apparently out of reach, Plaintiff filed this lawsuit on November 21, 2005. Several detours impeded the progress of the case, however: first, the Department moved to dismiss the complaint on the ground that the United States is a necessary and indispensable party to the case; this motion was denied. The Department next twice moved to dismiss, but each time the Department withdrew the motion before it was heard. Af-

---

3. *See* Music video: The Beatles, The Long and Winding Road, on Let It Be (EMI Records 1970), *http://www.youtube.com/watch?v=COMsKPeWAsw* (last visited Jan. 27, 2009).

4. *See* Music video: Gordon Lightfoot, Carefree Highway, on Sundown (Reprise Records 1974), *http://www.youtube.com/watch?v=lDTaUCvLpRQ* (last visited on Jan. 27, 2009).

5. On July 13, 2007, prior to the filing of these motions for summary judgment, the Department submitted a "Statement of Facts," while Plaintiff simultaneously submitted a proposed "Stipulation of Facts and Documents." The parties did not execute any formal stipulation; however, on the facts essential to this decision there appears to be no significant divide between the parties' submissions. Additionally, on August 31, 2007, in conjunction with his motion for summary judgment, Plaintiff sub-

mitted a Statement of Undisputed Facts. The Department has not submitted a responsive statement identifying any facts as to which there is a genuine issue in dispute. Under then-Local Rule 12.1, now supplanted by Local Rule Civil 56, any party opposing a motion for summary judgment is required to file "a concise statement of all material facts as to which he contends there is a genuine issue necessary to be litigated." Since the Department did not file any such statement, the Court deems admitted the facts Plaintiff provided.

6. The owner of the property is Stephen Haun and/or Haun Properties, LLC. Neither Mr. Haun nor Haun Properties, LLC is a party to or otherwise involved with this case.

ter a conference with the Court and upon agreement of the parties, Plaintiff filed an Amended and Supplemental Complaint ("Amended Complaint") to address the Department's issuance of its revised Outdoor Advertising Rules and Regulations ("RIDOT Rules"), which became effective on March 25, 2007.[7] Plaintiff then moved for summary judgment against the Department on all claims made in the Amended Complaint and the Department filed a cross-motion. Throughout the progression of this lawsuit, Vono has continued to display off-premise advertisements on his sign. The Department has voluntarily stayed the public nuisance enforcement action pending the resolution of this case.

## II. The Legal Landscape

### A. Federal Highway Beautification Act

In 1965, Congress enacted 23 U.S.C. § 131, also known as the Federal Highway Beautification Act ("FHBA") or the "Lady Bird Johnson Act." The FHBA seeks to curb the proliferation of signs along the nation's highways and to "protect the public investment in such highways, to promote the safety and recreational value of public travel, and to preserve natural beauty." *Id.* § 131(a). To these ends, the act requires states to effectively control the erection and maintenance of signs within 660 feet of interstate and primary highways and beyond 660 feet in non-urban areas if the signs are designed to be and are visible from such highways. 23 U.S.C. § 131(a), (c). The FHBA provides that if states fail to make provisions for effectively controlling such signs, they risk losing ten percent of their federal highway funds. *Id.* § 131(b).

### B. The Rhode Island Outdoor Advertising Act

In 1966, Rhode Island adopted the Outdoor Advertising Act ("RIOAA"), R.I. Gen. Laws §§ 24-10.1-1 *et seq.*, in order to comply with the FHBA. In so doing, the Rhode Island General Assembly declared as its purpose:

> to prevent unreasonable distraction of operators of motor vehicles, to prevent confusion with respect to compliance with traffic lights, signs, signals and regulations, to promote the safety, convenience, and enjoyment of travel upon highways within this state and to protect the public investment therein, to preserve and enhance the natural scenic beauty or aesthetic features of the highways and adjacent areas, and in the general welfare of the people of this state.

*Id.* The RIOAA declares that outdoor advertising erected in violation of its provisions constitutes a "public nuisance," *id.*, and that "[a]ny person, firm, corporation, or association who shall violate any of the provisions of this chapter shall, upon conviction, be fined not more than five hundred dollars ($500)." *Id.* § 24-10.1-8.

The RIOAA begins with a sweeping prohibition against "outdoor advertising" everywhere in the state, and then carves out a series of broad exceptions to the prohibition. R.I. Gen. Laws § 24-10.1-3. "Outdoor advertising" is defined as:

> an outdoor sign, display, light, device, figure, painting, drawing, message, plaque, poster, billboard, structure, or other thing which is designed, intended or used to advertise or inform, any part of the advertising or information contents of which is visible from any place

---

7. The revisions to the RIDOT Rules do not impact the issues raised by Plaintiff's motion. They are relevant only in that they resulted in the renumbering of several provisions of the rules and regulations.

on the main-traveled way of the interstate, primary, or secondary systems. R.I. Gen. Laws § 24–10.1–2(4). Exempt from this broad prohibition are numerous categories of signs:[8]

(1) Directional and other official signs and notices erected, maintained, or authorized by a public agency or body, which signs and notices shall include, but not be limited to, signs and notices pertaining to natural wonders and scenic and historic attractions, as authorized or required by law.

(2) Signs, displays, and devices advertising the sale or lease of property upon which they are located, subject, however, to the national standards as promulgated pursuant to the federal Highway Beautification Act of 1965.

(3) Signs, displays, and devices advertising activities conducted on the property upon which they are located, subject, however, to the national standards as promulgated pursuant to the federal Highway Beautification Act of 1965 including spacing requirements of the Rhode Island department of transportation rules and regulations governing outdoor advertising, except for signs that are allowed to be relocated as permitted in subsection (5).

(4) Bus shelters erected under the authority of the state department of transportation or Rhode Island public transit authority which shall be permitted no more than one two (2) sided sign. Each sign face shall be no more than twenty-four (24) square feet in size.

(5) Lawfully permitted signs, displays, and devices already in existence may be relocated to other permitted locations with the approval of the appropriate governmental agency(s), provided that the relocated outdoor advertising remains the same or smaller in size, and that such outdoor advertising conforms and is consistent with the municipal comprehensive plan and related zoning requirements.

(6) This chapter shall not preclude the maintenance of existing outdoor advertising.

R.I. Gen. Laws § 24–10.1–3.

The dispute in this case centers on the exception allowing the erection or maintenance of "[s]igns, displays, and devices advertising activities conducted on the property upon which they are located." *Id.* § 24–10.1–3(3). Such signs are known as "on-premise" signs.[9] The RIDOT has adopted outdoor advertising rules, the RIDOT Rules, that set forth more specific criteria for determining whether a particular sign is an on-premise sign:

The *on-premise advertising sign* shall have as its purpose [a] advertising of the sole and/or principal activity and/or it's [sic] products being sold and/or services rendered, or [b] advertising of the sale or lease of property on which the *on-*

---

**8.** "Sign, Sign, everywhere a sign. Blockin' out the scenery breakin' my mind. Do this, don't do that, can't you read the sign?" Five Man Electrical Band, Signs, on Good-byes and Butterflies (Lionel Records 1970).

**9.** An on-premise sign displays a message that bears some relationship to the activities conducted on the premises where the sign is located. A typical on-premise sign may identify a business, *e.g.* "Green Acres Landscaping," or it may advertise a product or service supplied at that location, *e.g.* "Fresh Mulch."

An off-premise sign displays a message unrelated to the location of the sign, *e.g.* it may alert motorists that they need drive only "5 More Miles to the Cowessett Inn." The terms "off-premise" and "on-premise," and "off-site" and "on-site," are interchangeable. Both on-premise and off-premise signs may display commercial or noncommercial messages. *See Ackerley Commc'ns of Mass., Inc. v. City of Cambridge,* 88 F.3d 33, 34 n. 1 (1st Cir.1996).

*premise advertising sign* is located, rather than the purpose of general advertising. An *on-premise advertising sign* identifying the establishments' [sic] principal and/or accessory products and/or services offered on the premises is an *on-premise advertising sign.*
RIDOT Rules, art. X(3) (emphasis in original). Furthermore, "[i]f any or all portion of a *sign* advertises activity or activities not conducted on the premises, and/or products or services not part of the principal activity, it is not an on-premise *sign.*" *Id.,* art. X(5) (emphasis in original).[10]

The RIDOT Rules set forth additional restrictions challenged by Plaintiff. First, they create an exemption for certain nonconforming signs: "*Signs* that are located in zoned and unzoned commercial and industrial areas and were legally *erected* in accordance with the laws and regulations in effect at the time of their erection, but do not comply with the criteria contained in Section VI 'A' of these *Rules and Regulations* may continue to be *maintained.* All such *signs* shall be classified as grandfathered *non-conforming* and must comply with the requirements of Section VIII." RIDOT Rules, § VI(C)(3) (emphasis in original). Second, they prohibit the advertisement of illegal activity: "*Signs* advertising activities that are illegal under State, Federal, or Local Laws, or State Regulations in effect at the location of such *signs* are prohibited." *Id.* § IX(3) (emphasis in original).

## C. First Amendment

■■■ The First Amendment of the United States Constitution "forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of

others." *Members of City Council of Los Angeles v. Taxpayers for Vincent,* 466 U.S. 789, 804, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984). But it does not guarantee the right to communicate one's views at all times and places or in any manner. *See Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.,* 452 U.S. 640, 647, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981). Both written and oral expression may be subject to reasonable time, place, and manner restrictions. *See Clark v. Cmty. for Creative Non–Violence,* 468 U.S. 288, 293, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984).

■■ The analysis of whether a particular restriction complies with the First Amendment usually begins by assigning it to one of two tiers: "content-neutral" or "content-based." For "regulations that suppress, disadvantage, or impose differential burdens upon speech because of its content," *i.e.* for content-based restrictions, the Court applies "the most exacting scrutiny." *Turner Broad. Sys., Inc. v. FCC,* 512 U.S. 622, 642, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994). Such content-based regulations are presumptively invalid, *see R.A.V. v. City of St. Paul, Minn.,* 505 U.S. 377, 382, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992), and they can withstand strict scrutiny only if precisely drawn to serve a compelling state interest. *See Consol. Edison Co. of N.Y. v. Pub. Serv. Comm'n of N.Y.,* 447 U.S. 530, 540, 100 S.Ct. 2326, 65 L.Ed.2d 319 (1980).

■■ For "regulations that are unrelated to the content of speech," *i.e.* content-neutral regulations, the Court applies an "intermediate level of scrutiny." *Turner Broad.,* 512 U.S. at 642, 114 S.Ct. 2445. Such content-neutral regulations are valid

---

10. Although the RIOAA and the RIDOT Rules do not, on their face, exclude noncommercial signs from the definition of on-premise signs, the RIDOT Rules define "on-premise advertis-

ing sign" as "a sign at a *business* location advertising a *business or businesses* that are conducted on the property." RIDOT Rules, art. III(24) (emphasis added).

provided they are narrowly tailored to serve a substantial governmental interest, *see City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 47, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986), and they do not unreasonably limit alternative channels for communicating the information. *Id.*; *see also Clark*, 468 U.S. at 293, 104 S.Ct. 3065; *Taxpayers for Vincent*, 466 U.S. at 808, 104 S.Ct. 2118; *Heffron*, 452 U.S. at 647–48, 101 S.Ct. 2559.

The Supreme Court has indicated a willingness to treat some content-based regulations as content-neutral if the regulations are motivated by a permissible content-neutral purpose. In *City of Renton*, the Court upheld a zoning ordinance that kept adult movie theaters out of residential neighborhoods. 475 U.S. at 48, 106 S.Ct. 925. The ordinance was not content-neutral, since it applied specifically to adult movie theaters, but the Court concluded that the ordinance was aimed at the "secondary effects"—such as crime and deteriorating property values—that such theaters fostered, rather than the content of the films shown. *Id.* at 47–48, 106 S.Ct. 925. Thus, the "ordinance [was] completely consistent with [the] definition of 'content-neutral' speech regulations as those that 'are *justified* without reference to the content of the regulated speech.'" *Id.* at 48, 106 S.Ct. 925 (quoting *Va. Pharmacy Bd. v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 771, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976)) (emphasis in original). Similarly, in *Ward v. Rock Against Racism*, 491 U.S. 781, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989), a city's noise control ordinance required all performers to use the city's sound equipment and sound technician for performances at a particular park. *Id.* at 787, 109 S.Ct. 2746. Noting that the principal justification for the guidelines was the city's desire to control noise levels and to avoid undue intrusion into residential areas and other areas of the park, *id.* at 792, 109 S.Ct. 2746, the Court upheld the ordinance as content-neutral. *Id.* at 791, 109 S.Ct. 2746 ("The principal inquiry in determining content neutrality, in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys.... The government's purpose is the controlling consideration.").

In contrast, in *Boos v. Barry*, 485 U.S. 312, 320–21, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988), the Court struck down part of an ordinance restricting speech critical of foreign governments near their embassies. The Court distinguished *City of Renton* on the basis that the ordinance restricting speech near embassies was:

> justified *only* by reference to the content of the speech. Respondents and the United States do not point to the "secondary effects" of picket signs in front of embassies. They do not point to congestion, to interference with ingress or egress, to visual clutter, or to the need to protect the security of embassies. Rather, they rely on the need to protect the dignity of foreign diplomatic personnel by shielding them from speech that is critical of their governments. This justification focuses *only* on the content of the speech and the direct impact that speech has on its listeners.

*Id.* at 321, 108 S.Ct. 1157.

Adding perhaps more confusion than clarity at the time, in *Metromedia, Inc. v. City of San Diego*, a case particularly relevant to government attempts to regulate billboard advertising, the Court considered the constitutionality of a city ordinance that imposed substantial prohibitions on erecting outdoor advertising displays. 453 U.S. 490, 493, 101 S.Ct. 2882, 69 L.Ed.2d

800 (1981) (White, J., plurality opinion). The San Diego ordinance prohibited all noncommercial signs, with certain limited exceptions, and off-site commercial signs, but allowed onsite commercial signs. *Id.* at 513–15, 101 S.Ct. 2882. In a plurality opinion, the Court upheld the ordinance as it pertained to prohibiting off-site commercial messages, but declared it unconstitutional in prohibiting noncommercial messages. Writing for the plurality, Justice White noted that, with respect to commercial messages:

> the city has a sufficient basis for believing that billboards are traffic hazards and are unattractive, [and] obviously the most direct and perhaps the only effective approach to solving the problems they create is to prohibit them. The city has gone no further than necessary in seeking to meet its ends.

*Id.* at 508, 101 S.Ct. 2882. But Justice White concluded that these same concerns did not warrant prohibiting billboards that contained noncommercial speech:

> The fact that the city may value commercial messages relating to onsite goods and services more than it values commercial communications relating to offsite goods and services does not justify prohibiting an occupant from displaying its own ideas or those of others.

*Id.* at 513, 101 S.Ct. 2882. The plurality concluded that because the ordinance "reaches too far into the realm of protected speech, . . . it is unconstitutional on its face." *Id.* at 521, 101 S.Ct. 2882.

The three dissenters also viewed the ordinance as tantamount to a blanket prohibition of billboards, but took a sort of good faith plus no harm/no foul approach to the analysis, saying they would have upheld it because they did not perceive "even a hint of bias or censorship in the city's actions" nor "any reason to believe that the overall communications market in San Diego is inadequate." *Id.* at 552–53, 101 S.Ct. 2882 (Stevens, J., dissenting in part); *see id.* at 563, 566, 101 S.Ct. 2882 (Burger, C.J., dissenting); *see also id.* at 569–70, 101 S.Ct. 2882 (Rehnquist, J., dissenting).

*Metromedia* was aptly described by Justice Rehnquist as a "virtual Tower of Babel, from which no definitive principles can be clearly drawn," *id.* at 569, 101 S.Ct. 2882 (Rehnquist, J., dissenting). Nevertheless the plurality opinion does strongly suggest that an off-premise/on-premise distinctions between noncommercial messages are invalid. *See* 453 U.S. at 513, 101 S.Ct. 2882 ("The fact that the city may value commercial messages relating to onsite goods and services more than it values commercial communications relating to offsite goods and services does not justify prohibiting an occupant from displaying its own ideas or those of others.").

Twelve years after *Metromedia*, in *City of Cincinnati v. Discovery Network, Inc.*, the Supreme Court declared unconstitutional an ordinance prohibiting newsracks on public property from distributing commercial handbills while allowing newsracks containing ordinary newspapers. 507 U.S. 410, 412, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993). The city argued that the ordinance was justified by concern over the secondary effects of commercial handbill newsracks with regard to safety and aesthetics. The Court rejected this argument, stating:

> Under the city's newsrack policy, whether any particular newsrack falls within the ban is determined by the content of the publication resting inside that newsrack. Thus, by any commonsense understanding of the term, the ban in this case is "content based."

*Id.* at 429, 113 S.Ct. 1505. The Court explained that "[i]n contrast to the speech at issue in *[City of] Renton,* there are no secondary effects attributable to . . . news-

racks [containing commercial handbills] that distinguish them from the newsracks [containing newspapers that the city] permits to remain on its sidewalks." *Id.* at 430, 113 S.Ct. 1505.

From these cases one can draw several conclusions that inform the analysis of the present dispute: first, content-based restrictions are subject to strict scrutiny while content-neutral restrictions are given more deference (so-called intermediate scrutiny); second, restrictions that are content-based but which seek to redress a non-content based problem (crime, crowd control, excessive noise, etc.) may be treated as content-neutral for First Amendment purposes; third, on-premises/off-premises distinctions, provided they relate only to the commercial speech of the business, may be constitutional; but the on-site/off-site distinction likely will not suffice to justify restrictions on noncommercial speech; and, finally, if the government seeks to restrict noncommercial speech—whether directly (e.g. prohibition on adult theaters) or indirectly (on-site vs. off-site)—the restriction must be justified by a legitimate concern over the secondary effects of the speech. With these guiding principles in mind the Court will move to the consideration of Rhode Island's on-site/off-site regulatory scheme.

## III. Standard of Review

Summary judgment is appropriately granted where there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and a fact is material if it has the

"potential to affect the outcome of the suit." *Velazquez–Garcia v. Horizon Lines of Puerto Rico, Inc.,* 473 F.3d 11, 15 (1st Cir.2007) (citations omitted).

■ Where there are no significant disagreements about the basic facts, a court may treat the parties as though they have submitted their dispute as a "case stated" and proceed to decide the case as a matter of law. *See EEOC v. Steamship Clerks Union, Local 1066,* 48 F.3d 594, 603 (1st Cir.1995) (citing *Federación de Empleados del Tribunal Gen. de Justicia v. Torres,* 747 F.2d 35, 36 (1st Cir.1984)).

## IV. Discussion

### A. Standing

■ The RIDOT argues, as a threshold matter, that a road block stands in the way of Plaintiff's suit. The Department contends that Plaintiff lacks the requisite standing to assert any constitutional challenge against the RIOAA and the RIDOT Rules. Standing to sue is, of course, an "indispensable component of federal court jurisdiction." *Osediacz v. City of Cranston,* 414 F.3d 136, 139 (1st Cir.2005). The "constitutional core" of standing requires that a plaintiff establish the existence of three elements: (1) an injury in fact, that (2) is fairly traceable to the disputed conduct, and that (3) will be redressed by the relief sought. *Id.; see also Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

■ In challenging Plaintiff's standing, the Department reasons that Plaintiff "has not engaged in any free speech activities, rather, he is selling space for a price." [11]

---

**11.** The Department only alluded to the issue of standing in its opposition to Plaintiff's motion, but addressed it in more depth in its "Initial Memorandum," which was filed before Plaintiff even moved for summary judg-ment. While it would not be inappropriate to disregard any argument not squarely presented in the Department's opposition, the Court is obligated to evaluate the justiciability of the disputes brought before it, regardless of the

In other words, argues the Department, "[t]he speech contained on [Plaintiff's] billboard is not his, rather, he agrees to create a sign and hang it for a period of time in exchange for payment." Thus, the Department argues, Plaintiff fails to show a sufficiently personalized injury emanating from the Department's enforcement action. To support this reasoning, the Department relies solely on *Advantage Media, LLC v. City of Eden Prairie*, 456 F.3d 793 (8th Cir.2006), in which an outdoor advertising agency challenged the constitutionality of a city sign code. The Eighth Circuit held that the advertising agency lacked standing to challenge provisions of the sign code that were not factors in the denial of its permit applications. *Id.* at 801 ("Since most of the content based restrictions and procedural mechanisms ... were not factors in the denial of its own permit applications, it cannot show causation with respect to them.").

*Advantage Media* simply affirms the general principle that in order to have standing to bring a First Amendment challenge a plaintiff must be contesting provisions upon which the restriction was based. *See, e.g., Brazos Valley Coalition for Life, Inc. v. City of Bryan, Texas*, 421 F.3d 314, 323 (5th Cir.2005) (no standing to challenge ordinance that did not apply to plaintiff's activities); *Gospel Missions of Am. v. City of Los Angeles*, 328 F.3d 548, 554 (9th Cir.2003) (plaintiff's First Amendment claim was not fairly traceable to its injury because provision challenged was not the basis for restricting solicitation). In other words, a favorable decision must allow the plaintiff to engage in the previously prohibited speech. *See N. Ave. Novelties, Inc. v. City of Chicago*, 88 F.3d 441, 444 (7th Cir.1996) (plaintiff bookstore had standing because it challenged all provisions of zoning code that could preclude its operation); *compare Harp Adver. Ill., Inc. v. Vill. of Chicago Ridge, Ill.*, 9 F.3d 1290, 1292 (7th Cir.1993) (plaintiff advertiser's inability to erect billboard would not be redressed by favorable decision because an unchallenged portion of sign code would block construction).

Here, Plaintiff has satisfied the "constitutional core" of standing with respect to his primary constitutional challenge. First, he has suffered an injury-in-fact. His sign has been declared to be a public nuisance and he has been subjected to an enforcement action in which the Department has ordered him to remove the advertisement. Second, unlike the plaintiff in *Advantage Media*, who could not show causation with respect to the challenged regulatory provisions, there is no dispute that Plaintiff's injury has been, and continues to be, caused by the restriction on off-premise signs. Lastly, his injury is redressable because a favorable decision on the merits would allow him to display off-premise messages, as he has in the past. Having said this, as will be explained later in this opinion, not all of Plaintiff's claims are justiciable, and those of Plaintiff's claims that · are not properly before the Court will be dismissed.

### B. Plaintiff's Claims

Plaintiff's Amended Complaint sets forth six legal claims: (1) the RIOAA and RIDOT Rules violate the First Amendment because the distinction between on-premise and off-premise signs is an impermissible content-based restriction on speech;

arguments made (or not made) by the parties. *See Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 127 S.Ct. 2738, 2750–51, 168 L.Ed.2d 508 (2007) (Court determined that plaintiff had standing even though defendant did not challenge jurisdiction); *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 546–47, 106 S.Ct. 1326, 89 L.Ed.2d 501 (1986) (lack of standing not raised by either party).

(2) the RIOAA and RIDOT Rules violate the First Amendment because they disadvantage noncommercial speech; (3) the RIOAA and RIDOT Rules violate the First Amendment because they vest government authorities with unbridled discretion over whether any particular sign will be allowed; (4) Plaintiff's right to procedural due process was violated when the Department declared his sign to be a public nuisance; (5) the RIDOT Rules violate the First Amendment because they allow the continued maintenance of so-called "grandfathered nonconforming" signs; and (6) the RIDOT Rules violate the First Amendment because they prohibit the display of signs advertising illegal activities.

1.  Content-based vs. Content-neutral

█ Plaintiff's first, and primary, contention is that the state's prohibition of off-premise signs is an impermissible content-based speech restriction. On an initial pass, the RIOAA appears content-neutral because it is, at least to some extent, *"justified* without reference to the content of the regulated speech." *See City of Renton,* 475 U.S. at 48, 106 S.Ct. 925 (quotation omitted) (emphasis in original). In other words, the Rhode Island General Assembly did not adopt the RIOAA because it disagreed with any specific messages that might be conveyed on billboards; and, neither the statute nor the regulations endorse any particular viewpoint. Rather, the General Assembly adopted the RIOAA to control the effects of billboards and signs along the interstate and primary highway system and presumably to ensure receipt of federal highway funds. *See* R.I. Gen. Laws § 24–10.1–1. While it is true that the "principal inquiry in determining content neutrality" is "whether the government has adopted a regulation of speech because of [agreement or] disagreement with the message it conveys," *Turner Broad.,* 512 U.S. at 642, 114

S.Ct. 2445, "the mere assertion of a content-neutral purpose [is not] enough to save a law which, on its face, discriminates based on content." *Id.* at 642–43, 114 S.Ct. 2445 (internal quotation marks omitted).

█ Despite the expressly neutral intent, a more exacting review reveals that the RIOAA and RIDOT Rules effectively make content-based distinctions between on-premise noncommercial messages and off-premise noncommercial messages. This is because, with rare exception, "the First Amendment does not permit [the state] to value certain types of noncommercial speech more highly than others." *Ackerley Commc'ns of Mass. v. City of Cambridge,* 88 F.3d 33, 37 (1st Cir.1996). As explained in *Metromedia,* regulatory choices must be constrained in the area of noncommercial speech:

> Although [San Diego] may distinguish between the relative value of different categories of commercial speech, the city does not have the same range of choice in the area of noncommercial speech to evaluate the strength of, or distinguish between, various communicative interests.... Because some noncommercial messages may be conveyed on billboards throughout the commercial and industrial zones, San Diego must similarly allow billboards conveying other noncommercial messages throughout those zones.

453 U.S. at 514–15, 101 S.Ct. 2882 (citations omitted) (invalidating content-based exceptions to San Diego's general ban on noncommercial messages). Since here, "whether a sign may stay up or must come down requires consideration of the message it carries," *Ackerley,* 88 F.3d at 37 n. 7, (*i.e.* the Department must review a sign's content in order to determine whether that sign is permitted under the RIOAA) the RIOAA imposes a content-based restriction on noncommercial

speech. And, content-based regulations of noncommercial speech are presumptively unconstitutional. *See Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983).

Admittedly, this conclusion appears to be at odds with decisions in other jurisdictions that have held similar distinctions to be content-neutral. The Third, Sixth, and Eleventh Circuits have upheld the on-premise/off-premise distinction as a content-neutral time, place, or manner restriction, regardless of whether the subject is commercial or noncommercial advertising. *See Rappa v. New Castle County*, 18 F.3d 1043, 1067 (3d Cir.1994); *Messer v. City of Douglasville, Ga.*, 975 F.2d 1505, 1509–11 (11th Cir.1992); [12] *Wheeler v. Comm'r of Highways*, 822 F.2d 586, 589–90 (6th Cir. 1987). The First Circuit, however, appears to have chosen the road less traveled [13] and commanded a different result with *Ackerley*, 88 F.3d 33. In *Ackerley*, the Court was presented with a zoning ordinance that tightened restrictions on the height, size, number and location of signs that could be displayed in the City of Cambridge, Massachusetts. The ordinance itself made no distinctions based on the messages displayed on the signs. However, a state statute, the Massachusetts Zoning Act ("MZA"), mandated grandfather protection for all nonconforming signs that were in existence at the time the zoning ordinance was amended. The MZA excluded from its protection billboards, signs and other advertising devices subject to the jurisdiction of the Massachusetts Outdoor Advertising Board ("OAB"). The OAB regulated off-premise signs. The combined effect of the city ordinance and MZA, therefore, was to protect signs that did not conform to the amended Cambridge ordinance only if they carried on-premise messages when the ordinance was adopted. None of the plaintiff's billboards were grandfathered under this scheme because all of its messages were off-premise messages. Thus, the plaintiff's noncommercial, off-premises messages had to be removed while nonconforming commercial signs were protected. City officials justified the preference for on-premise signs by appealing to aesthetics:

> Nonconforming off-premise signs, which traditionally have been used primarily to advertise commercial goods and services not available on the same premises, have a significantly greater adverse aesthetic impact than on premises signs because of their larger sizes, greater heights, less attractive appearances, and/or more intrusive locations.

*Ackerley*, 88 F.3d at 34–35 (quoting Zoning Ordinance).

In evaluating the constitutionality of the Cambridge ordinance, the First Circuit ostensibly chose to "sidestep [the] difficult question" of whether the ordinance was content-based and decide the matter based on "two readily identifiable First Amendment flaws that bar [the ordinance's] enforcement." [14]  *Id.* at 37. The first of

---

**12.** *But see Southlake Prop. Assocs., Ltd. v. City of Morrow, Ga.*, 112 F.3d 1114, 1116–19 (11th Cir.1997) (noting that Messer depended on the fact that the City of Douglasville's ordinance applied to a historic district and construing the City of Morrow's on-premise/off-premise distinction as applying only to commercial messages).

**13.** Music video: George Straight, The Road Less Traveled, on The Road Less Traveled (MCA Records 2001), *http://www.youtube.com/watch?v=E7CTNDSDKlg* (last visited on Jan. 27, 2009).

**14.** The First Circuit observed, however, that, at least "[i]n 'commonsense' terms, the distinction surely is content-based." *Ackerley*, 88 F.3d at 36 n. 7. This is an echo of *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993). In *Discovery Network*, the City of

these flaws was that the ordinance distinguished among categories of noncommercial speech: [15]

> While not facially preferring commercial messages to noncommercial ones—a preference barred by *Metromedia*—the Cambridge scheme does draw a line between two types of noncommercial speech—onsite and offsite messages. This line has the effect of disadvantaging the category of *noncommercial* speech that is probably the most highly protected: the expression of ideas. The only signs containing noncommercial messages that are exempted are those relating to the premises on which they stand, which inevitably will mean signs identifying nonprofit institutions.

*Id.* Noting the City's emphasis on the important role of on-premise signs in promoting socially important activities, the panel explained that "with rare exceptions, the First Amendment does not permit Cambridge to value certain types of noncommercial speech more highly than others, particularly when the speech disfavored includes some—like political speech—that is at the core of the First Amendment's value system." *Id.* Since a content-neutral restriction would not "value certain types of noncommercial speech more highly than others," the First Circuit essentially acknowledged that as applied to *noncommercial* speech, the off-premise/on-premise distinction constitutes a content-based restriction. A careful reading of *Ackerley* then would appear to belie the Court's claim that it was side stepping the "difficult question" of content neutrality. Indeed it appears to this writer that the Court quite clearly decided that the Cambridge ordinance was *not* content neutral because it valued certain types of noncommercial speech over other types, to the disadvantage of the most highly valued noncommercial speech (political speech). And so it is here: the RIOAA and the implementing regulation of the RIDOT in effect, do exactly what *Ackerley* forbade: valuing certain types of noncommercial speech (on-site) over other types (off-site).

Moreover, the appeal by Cambridge to aesthetics seemed to fall on deaf ears in the First Circuit, at least with respect to the effect the ordinance has on highly valued noncommercial speech. The RIDOT's plea here is even less compelling than Cambridge's in *Ackerley*. Therefore the protection offered by cases like City of *Renton* and *Discovery Network* which allow for a content-based regulation to be treated as content neutral based on the "justification" for the regulation were of no help to Cambridge, and offer no cover for the RIDOT here. *See Discovery Network,* 507 U.S. at 429, 113 S.Ct. 1505. In fact, the Department has put forward nothing to suggest the secondary effects attributable to the noncommercial speech the RIOAA silences differ in anyway from the

---

Cincinnati had "enacted a sweeping ban on the use of newsracks that distribute 'commercial handbills,' but not 'newspapers.'" 507 U.S. at 429, 113 S.Ct. 1505. Accordingly, wrote the Court, "whether any particular newsrack falls within the ban is determined by the content of the publication resting inside that newsrack. Thus, by any commonsense understanding of the term, the ban in this case is 'content based.'" *Id.*

**15.** The second flaw, which is not relevant to this discussion, dealt with the grandfathering provision of the ordinance and stemmed from the fact that only those sign owners who were displaying on-site messages on the date of enactment were allowed to change their signs to display noncommercial messages. The Court took issue with this content-based approach to grandfathering because, in the Court's view, the provision translated into the government telling its citizens who may speak and who may not—a fundamentally unconstitutional behavior. *Ackerley,* 88 F.3d at 38–39.

effects of on-premise commercial speech that is allowed.

## 2. Commercial vs. Noncommercial Speech

The RIOAA and RIDOT Rules also prefer commercial speech over noncommercial speech, and such preferences also are presumed invalid. *See Metromedia,* 453 U.S. at 510, 101 S.Ct. 2882. In *Metromedia,* six of the nine Supreme Court justices agreed that the First Amendment affords greater protection to noncommercial billboards than to commercial billboards. *See id.* at 513, 101 S.Ct. 2882 (plurality opinion); *id.* at 536, 101 S.Ct. 2882 (Brennan, J., concurring in the judgment). A rule that would allow the display of commercial messages where noncommercial messages are not permitted would invert this First Amendment hierarchy. *Id.* at 513, 101 S.Ct. 2882; *see also Ackerley,* 88 F.3d at 39 n. 15 ("In addition, First Amendment values are inverted: [Plaintiff's] signs would be protected if they contained (onsite) commercial messages but not if they contained (offsite) noncommercial ones.").

As explained in *Metromedia,* the billboard ordinance in that case impermissibly preferred commercial to noncommercial speech because it allowed on-premise commercial messages but generally prohibited noncommercial messages. *Metromedia,* 453 U.S. at 513, 101 S.Ct. 2882. "The fact that [Rhode Island] may value commercial messages relating to onsite goods and services more than it values commercial communications relating to offsite goods and services does not justify prohibiting an occupant from displaying its own ideas or those of others." *Id.* "In other words, if the owner of Joe's Hardware wants to replace his 'Joe's Hardware' sign with a sign saying 'No Nukes,' he must be allowed to do so." *Ackerley Commc'ns of Mass., Inc. v. City of Somerville,* 878 F.2d 513, 517 (1st Cir.1989) (explaining that this result "follows logically from the First Amendment's value structure" because "if a commercial message overrides the city's aesthetics and safety interests, any message that is at least as important in the First Amendment hierarchy also must override those interests"); *see also Nat'l Adver. Co. v. Town of Babylon,* 900 F.2d 551, 554 (2d Cir.1990) (affirming injunction against Islip billboard ordinance because, inter alia, the ordinance would not allow a business like "Joe's Famous Pizza" to install a noncommercial off-premise sign stating that "Abortion is Murder") (internal quotation marks omitted).

■ The RIOAA broadly defines "outdoor advertising" to include "advertising or information," R.I. Gen. Laws § 24–10.1–2(4), a definition that reasonably can be said to encompass both commercial and noncommercial speech.[16] In practice, however, the RIOAA's on-premise/off-premise distinction does not allow any noncommercial speech wherever a commercial message would be permissible. *Cf. Metromedia,* 453 U.S. at 513, 101 S.Ct. 2882. The owner of a music store, to take one example, could not replace her "Drums For Sale" sign with a "Cut Property Taxes Now!" message unless she conducted some tax-related activity in the music store. So, while the drum seller, under Rhode Island's scheme, could not advertise cars she also would be prohibited from expressing her strongly held views to limit taxes, to stop the war, support a candidate, or root

---

**16.** Its acquiescence to on-premise noncommercial signs somewhat distinguishes the RIOAA from the ordinance in *Metromedia.* That ordinance allowed on-site commercial signs, but prohibited off-site commercial advertising and *all* noncommercial advertising unless permitted by one of twelve exemptions. *Metromedia,* 453 U.S. at 494–96, 101 S.Ct. 2882.

for the Red Sox. Rhode Island thus has decided that, at least in most cases, "the communication of commercial information concerning goods and services ... is of greater value than the communication of noncommercial messages." *Metromedia,* 453 U.S. at 513, 101 S.Ct. 2882. These prohibited noncommercial messages include political speech, the most highly prized category of speech. Because this prohibition inverts the First Amendment's hierarchy of noncommercial and commercial speech, it is unconstitutional unless it can meet the difficult requirements of strict scrutiny.

### 3. Strict Scrutiny

Since the RIOAA and RIDOT Rules impose content-based restrictions on non-commercial speech and prefer commercial speech to noncommercial speech, they can survive a First Amendment challenge only if they satisfy the demands of strict scrutiny. *See United States v. Playboy Entm't Group, Inc.,* 529 U.S. 803, 813, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000). To survive, such restrictions must be narrowly tailored to promote a compelling government interest. *Id.*; *Sable Commc'ns of Cal., Inc. v. FCC,* 492 U.S. 115, 126, 109 S.Ct. 2829, 106 L.Ed.2d 93 (1989). They must be the least restrictive means available to serve the government's purpose. *Playboy Entm't,* 529 U.S. at 813, 120 S.Ct. 1878; *Sable Commc'ns,* 492 U.S. at 126, 109 S.Ct. 2829 ("The Government may ... regulate the content of constitutionally protected speech in order to promote a compelling interest if it chooses the least restrictive means to further the articulated interest.").

Here, even if it is assumed for purposes of the analysis that the State has articulated a compelling interest in restricting off-premise noncommercial signs, the Department's burden is great. To justify the preference for commercial (or on-premises noncommercial) messages, the Department must explain "how or why noncommercial billboards located in places where commercial billboards are permitted would be more threatening to safe driving or would detract more from the beauty of the [State]" than would commercial billboards. *Metromedia,* 453 U.S. at 513, 101 S.Ct. 2882. The Department must also explain how the content-based on-premise/off-premise distinction among noncommercial messages furthers the state's goals. *See Ackerley,* 88 F.3d at 38 (holding that where a city distinguishes between on-premise and off-premise noncommercial messages, the city must justify that distinction in relation to its asserted goals). Moreover, to succeed the Department must also prove that the RIOAA and RIDOT Rules represent the least restrictive method available to further the State's interests. With respect to the statute's on-premise/off-premise distinction, this appears to be a near impossible task.

Similarly inclined cities and states have solved their constitutional problems with these laws by exempting from prohibition all noncommercial messages or allowing the substitution of on-premise or off-premise noncommercial billboards wherever any commercial billboard is allowed; this simple approach effectively removes the restriction on all noncommercial speech, leaving the distinction between on-premise and off-premise commercial speech intact. The result is to restore the hierarchy of speech protection under the First Amendment. *See, e.g.,* Seattle Municipal Code § 23.84.036 (providing that noncommercial signs are always to be considered on-premise); *Clear Channel Outdoor Inc. v. City of Los Angeles,* 340 F.3d 810, 814–15 (9th Cir.2003) (discussing amendment to Los Angeles Municipal Code that "makes it impossible that a noncommercial sign would be designated an 'off-site' sign");

*Valley Outdoor, Inc. v. County of Riverside*, 337 F.3d 1111, 1113 (9th Cir.2003) (discussing amendment to Riverside ordinance that allows any noncommercial message to be substituted for a commercial message on any otherwise lawful sign); *Outdoor Sys., Inc. v. City of Mesa*, 997 F.2d 604, 608–609 (9th Cir.1993) (discussing substitution provisions in Tucson and Mesa sign codes and express exemption for noncommercial messages in Mesa's code); *Nat'l Adver. Co. v. City and County of Denver*, 912 F.2d 405, 408 (10th Cir. 1990) (discussing Denver ordinance that prohibits off-premise commercial signs while allowing on-premise commercial signs and off-premise or on-premise noncommercial signs). *Cf. Southlake Prop. Assocs., Ltd. v. City of Morrow, Ga.*, 112 F.3d 1114, 1119 (11th Cir.1997) (analyzing all noncommercial speech as on-premise speech); *Nat'l Adver.*, 900 F.2d at 556–57 (explaining that after *Metromedia* municipalities responded "by permitting noncommercial messages wherever commercial messages were allowed" and faulting Islip for not making a similar change, even though "it would have been a simple matter to draft such a provision"). Rhode Island has not taken either of these roads in spite of the opportunity to do so in its recently revised RIDOT implementing regulations.[17]

### 4. Procedural Due Process

Plaintiff's claim that he was denied procedural due process is premised on his assertion that the Department declared his sign to be unlawful and a public nuisance without having even charged Plaintiff with any offense or offered to provide him with an opportunity to be heard. "To prevail on [his] procedural due process claim,

[Plaintiff] must show both that [he] had a recognized liberty or property interest, and [that he] was deprived of that interest without adequate notice or a meaningful opportunity to be heard." *See Jordan Hosp., Inc. v. Shalala*, 276 F.3d 72, 78 (1st Cir.2002) (citing *Mathews v. Eldridge*, 424 U.S. 319, 332–35, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976)). Plaintiff's claim fails because he cannot show that he actually was deprived of any property interest.

First, although the Department declared in a letter to Plaintiff that his sign constituted a public nuisance, the sign has not been removed. Nor has Plaintiff paid any fines or incurred any penalties (aside from litigation, which is often penalty enough for anyone). Second, unless and until the Department successfully appeals this decision, Plaintiff's sign will remain in its current location, and Plaintiff will be able to display advertising in accordance with the Court's holding. Consequently, there has been no due process violation.

### 5. Grandfathering

Likewise, Plaintiff's challenge of the RIDOT Rules' exemption for "grandfathered nonconforming" signs, RIDOT Rules § VI(c), fails for the simple reason that Plaintiff has not shown how this provision prevents him from displaying his preferred messages.

The RIDOT Rules provide that nonconforming signs may continue to be maintained if they are located in "zoned and unzoned commercial and industrial areas and were legally erected in accordance with laws and regulations in effect at the time of their erection." RIDOT Rules

---

17. Plaintiff also put forth the claim that the RIOAA and RIDOT Rules are unconstitutional because they vest the Department with unbridled discretion to determine whether a sign is an on-premise or off-premise sign. Based on the Court's findings herein, the Court sees no reason to reach this argument.

§ VI(c). Such signs are classified as "grandfathered nonconforming." *Id.* Plaintiff challenges provisions that allow the continued use of nonconforming signs under certain conditions. Those conditions provide that nonconforming signs shall lose their protected status if the message they carry is "obsolete" or "does not identify a particular product, service or facility that is currently available to the motorist." *Id.* § VIII(B)(1). The Department may declare a grandfathered nonconforming sign to be "terminated" or "abandoned" based on whether it displays an obsolete or otherwise outmoded message. *Id.* §§ VIII(B)(1), (C)(1).

Plaintiff argues that his right to free expression is infringed by the protection given to grandfathered signs because the protective regulations "grant certain rights to continued or future speech based upon past speech, an impermissible criterion under the First Amendment." However, Plaintiff has not made any showing that invalidating the grandfathering provision would allow him to display his preferred messages. He has not alleged that his sign would be a protected nonconforming sign in the absence of the regulation. Indeed, there is nothing in the record revealing when Plaintiff's sign was erected, making it impossible to determine whether the sign was "legally erected in accordance with laws and regulations in effect at the time of [its] erection." RIDOT Rules § VI(c).

In other words, "[s]ince ... the[se] content based restrictions and procedural mechanisms ... were not factors in [the Department's administrative action against Plaintiff], [Plaintiff] cannot show causation with respect to them." *Advantage Media,* 456 F.3d at 801. Plaintiff's challenge therefore fails for lack of standing. *Id.*; *cf. Ackerley,* 88 F.3d at 34 (plaintiff's signs would be grandfathered in the absence of challenged provision requiring such signs to carry on-premise messages).

6. Advertisement of Illegal Activities

Plaintiff's final claim is that the RIDOT Rules, in prohibiting "signs advertising activities that are illegal," RIDOT Rule § IX(3), impose "a content-based restriction on speech, which in no way serves a valid governmental interest." Here, again, there is not a shred of evidence that Plaintiff is at any imminent risk of displaying advertisements potentially in violation of this provision. At most, Plaintiff has asserted that he could be subject to legal jeopardy "if" he displayed certain kinds of signs, but this is no different than asserting that he may be arrested if he gives a speech on the courthouse steps. Since he has not attempted the speech, he cannot claim an injury in fact, and therefore has no standing.

But even if Plaintiff satisfies the standing requirement, his claim fails on a misunderstanding of the law. It is settled that the First Amendment does not protect commercial advertisements of unlawful activities. *See 44 Liquormart, Inc. v. Rhode Island,* 517 U.S. 484, 497 n. 7, 116 S.Ct. 1495, 134 L.Ed.2d 711 (1996) (citation omitted); *Central Hudson v. Pub. Serv. Comm'n of N.Y.,* 447 U.S. 557, 563, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980). Even noncommercial speech may be restricted if it consists of incitement to imminent unlawful activity. *See Brandenburg v. Ohio,* 395 U.S. 444, 447, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969); *see also Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations,* 413 U.S. 376, 390, 93 S.Ct. 2553, 37 L.Ed.2d 669 (1973); *Times Film Corp. v. City of Chicago,* 365 U.S. 43, 47–48, 81 S.Ct. 391, 5 L.Ed.2d 403 (1961).

Plaintiff's professed concern that his billboard may become illegal if it contains a "political message" is belied by the specific prohibition in the RIDOT Rules

against "advertising [of illegal] *activities.*" RIDOT Rules § IX(3). The regulation, by itself, does not prohibit political speech advocating for one position or another, even if the advocacy might relate to currently illegal activities. For example, assuming that no valid restriction would otherwise preclude the display, Plaintiff's sign could contain a message advocating for the legalization of marijuana or statewide gambling and clearly not run afoul of § IX(3). What it could not contain is a message advertising or inciting an unlawful activity, such as selling illegal narcotics or gambling. *See, e.g., Rice v. Paladin Enters., Inc.,* 128 F.3d 233 242–43 (4th Cir.1997) (publisher of manual containing detailed instructions on how to murder and become a professional killer not protected by First Amendment); *United States v. Barnett,* 667 F.2d 835, 843 (9th Cir.1982) (First Amendment did not provide a defense against search or prosecution for defendant who produced and sold instructions for the manufacture of phenylcyclidine (PCP) to a person who manufactured the illegal drug by following the instructions). In short, Plaintiff's challenge to this provision fails for lack of standing, but would be substantively insufficient in any event.

V. Conclusion

For the foregoing reasons, Plaintiff's Motion for Summary Judgment is GRANTED as to Counts I and II; Count III is dismissed as moot and Counts IV, V, and VI are dismissed for lack of standing; the Department's Cross–Motion for Summary Judgment is DENIED.

IT IS SO ORDERED.